619 A.2d 186

**Gregory Allen McCORKLE**

v.

**STATE of Maryland.**

**No. 666, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

Jan. 29, 1993.

Reconsideration Granted in Part Feb. 23, 1993,
Opinion Corrected Feb. 24, 1993.

Patrick J. Hoover, Rockville, for appellant.

Sarah E. Page, Asst. Atty. Gen., Baltimore (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Andrew L. Sonner, State's Atty. for Montgomery County, Rockville, on the brief), for appellee.

Argued before MOYLAN, ALPERT and FISCHER, JJ.

ALPERT, Judge.

In the fourth year of President James Monroe's second term (1824), Supreme Court Justice Story declared the pole-star of mistrial/double jeopardy cases: the "manifest necessity" rule.

The issue in this case is whether the trial court correctly declared a mistrial based on the unexpected absence of the key prosecution witness. In contending that the mistrial was declared improperly, appellant Gregory Allen McCorkle has asked us to address the following six questions:

1. Did the trial judge fail to exercise sound discretion in declaring the existence of manifest necessity for a mistrial and permitting reprosecution of the defendant?

2. Was a mistrial improperly granted where the State failed to shoulder the burden of demonstrating manifest necessity, and the trial judge declared the mistrial on independent grounds not asserted by the State?

3. Did the trial judge err in holding that absence of a prosecution witness was grounds for mistrial where no state policy or important interest of judicial administration was at issue?

4. Did the trial judge commit an abuse of discretion by ignoring evidence of the State's negligent handling of its witness and its assumption of the risk of the witness's failure to appear?

5. Was manifest necessity precluded by the potential for manipulation inherent in the circumstances of the State's motion for mistrial?

6. Did the trial judge err in neglecting to consider reasonable alternatives to the mistrial, thus barring a retrial of the defendant?

We agree with the State that these six questions are a variation on the theme as to whether the trial court properly exercised its discretion in declaring a mistrial. Consequently, we have combined appellant's six issues into a single question, to wit:

WAS THE TRIAL COURT'S DECLARATION OF A MISTRIAL BASED ON MANIFEST NECESSITY?

We hold that it was, and therefore we shall affirm.

## I.

By indictment filed on June 21, 1991 with the Circuit Court for Montgomery County, appellant was charged with two criminal counts arising out of an incident that occurred on or about May 27, 1991 at appellant's place of employment[1]: (1) felony theft (*i.e.*, theft in excess of $300), in violation of Md.Code art. 27, § 342, and (2) making a false statement to a police officer, in violation of § 150 of Article 27.

---

[1] The State contends that appellant, while he was working in a managerial capacity at a Hardee's franchise, falsely reported that he was forced—at gunpoint—to open the Hardee's safe and turn over to the robbers $3500.00. The State further contends that, rather than having been robbed, appellant himself took the money.

The record reflects that this indictment resulted primarily from statements given to police by one Cyrus Wayne Morrison, appellant's former roommate and homosexual lover. The record also reflects that Morrison gave police these statements shortly after appellant had begun dating a woman to whom appellant would subsequently become engaged to be married. Further testimony indicated that, following his break-up with appellant—but prior to reporting appellant's alleged crimes—Morrison was "really distraught, he was severely depressed, he was sad, he was unhappy of the fact [that appellant] was no longer his boyfriend, that [appellant] was seeing a girl now, Michelle." (Mr. Morrison's subsequent unavailability to testify at trial would come to form the basis for the appeal *sub judice*.)

Nevertheless, appellant made his initial appearance on July 12, 1991, and entered a plea of not guilty to both charges. Subsequently, a jury trial on the merits (DeLawrence Beard, J., presiding) proceeded over several days in the following manner:

On February 12, 1992, the jury was sworn and trial commenced.

On February 13, 1992, counsel gave their opening statements, and the first three witnesses were heard on behalf of the State: (1) Police officer Stewart Myers, one of two officers who initially responded to appellant's report of robbery, (2) Fernando Calderon, an eighteen year old fact witness who overheard appellant's phone call whereby appellant reported the alleged robbery, and (3) Police officer Steven Auger, the other officer who initially responded to appellant's call. As part of its aforesaid opening statement, the State explicitly identified Morrison as its "key witness," and, accordingly, spent a considerable amount of effort introducing the jury to Mr. Morrison's expected testimony. For its part, the defense's opening statement also identified Mr. Morrison as the State's key witness; correspondingly, the defense also focused extensively on Morrison's expected testimony, as well as his potential motives for so giving it.

On February 14, 1992, the State presented its fourth witness, Mark A. Marino, general manager of the subject Hardee's. Following Mr. Marino's testimony, the defense was permitted to call—out of order—its first witness, Dorothy Davis, appellant's mother. Ms. Davis's testimony concerned, *inter alia,* two recent conversations she had had at her hotel with Morrison, one of which occurred the night of February 12th (*i.e.,* the first night of the trial), and the other which occurred the following night (February 13th, *i.e.,* the night before she gave her testimony). As is relevant presently, Ms. Davis stated (on direct examination) that Morrison had indicated to her a reluctance to testify:

> He [Morrison] said he didn't want to testify because everything had been blown and twisted out of proportion, there were things that were said that he didn't say and he didn't want to testify. * * * *
>
> And I said [to Morrison], "If you say you don't remember what they're talking about, then you tell them that, because you have to go to court," because he said he wasn't going to show up.
>
> Q: So, you told him to come?
>
> A: I said, "If you don't come, they will put you in jail, and if the court sets another date, you may sit in jail for a month or two while they get another trial date."

Following a long holiday weekend, trial recommenced on February 18, 1992. As a preliminary matter, Barry A. Hamilton, Esquire, the prosecutor, indicated that he had two witnesses left in his case in chief. One of them, Detective Ed Tarney, who had investigated the incident, was then ready to testify; the other witness, however, was Morrison, who was—it was believed—temporarily unavailable. Mr. Hamilton explained Morrison's February 18, 1992 absence to the Court:

> I spoke to Mr. Morrison, and Ms. Land of my office, we have both spoken to Mr. Morrison today. I spoke to him as recently as approximately one hour ago. He called Ms. Land early this morning to report that he was ill. I spoke to him at some length, again about an hour ago.

He again informed me that he was ill, and that if at all possible would prefer not [to] have to testify today, but [he] would be here bright and early tomorrow morning to testify.

I told him that I could not speak for the Court, but I would try to seek that indulgence from the Court. I am convinced of his bona fides in this matter, and would ask that the Court give us that consideration to take Detective Tarney's testimony, and then suspend until tomorrow morning to allow Mr. Morrison to testify.

He has been in—he was in my office both last Wednesday [February 12, 1992, *i.e.*, the first day of trial] and last Thursday [February 13] all day long. Of course, because of the way things went, we were not able to get to him [earlier than today].

Following Mr. Hamilton's explanation, the court permitted the State to present the testimony of Detective Tarney. During a recess (which occurred during a break in Detective Tarney's testimony), Judge Beard met with counsel in chambers and made a conference call to Morrison at Morrison's home. After the recess, and following the completion of Detective Tarney's testimony, Judge Beard and counsel recounted—on the record—the content of the conference call with Morrison:

THE COURT:

I asked him [Morrison] if he was ambulatory, could he walk. I wanted to know if the man was, as they say, somewhat disabled, or he just didn't feel well. There is a difference between the two. I asked him if he was ambulatory, and he said he could walk, but he was in the process of cleaning up his bathroom, where he had vomited essentially.

That his stomach was upset. That he would be available tomorrow morning [February 19th]. I told him that we would be looking for him tomorrow at 9:30 [a.m.], that he could come in. But he said he could come in, but he didn't feel like it, and he was ill, physically ill.

MR. HOOVER [defense counsel]:

Thank you for that, Your Honor. That is, of course, absolutely correct, and accurate.

THE COURT:

He said he had been vomiting all day, as I recall. Well, since this morning. He also indicated that he had had some telephone conversations with Mr. Hamilton. Which confirms what Mr. Hamilton had indicated to us, I believe, on the record, in court before we retired to chambers at my request.

After the above was made a part of the record, and following an objection by defense counsel that appellant was being prejudiced by the delay caused by Morrison's absence, the State requested permission from the court to have Detective Tarney retake the stand. The court granted the State's request, and the following exchange resulted:

BY MR. HAMILTON:

Q Very briefly, Detective Tarney, you testified on cross examination that you served Mr. Morrison with a summons to testify before the Grand Jury, is that correct?

A That is correct.

Q Okay. Just so there is no misunderstanding of the procedure involved. By saying that, does that mean that you actually physically brought him in to testify before the Grand Jury, or simply delivered a document notifying him of a date and place and time to appear?

A I just delivered [to] him a document.

Q To the best of your knowledge did Mr. Morrison appear at the appointed time and place to testify?

A Yes.

Q Did you actually see him the date that he testified before the Grand Jury?

A I believe I did, yes.

Following Detective Tarney's brief additional testimony, the court recessed for the day.

The next day, February 19, 1992, Mr. Morrison again failed to appear. And, again, the State explained Morrison's absence to the court:

MR. HAMILTON:

Your Honor, Mr. Morrison called my office—called Ms. Slan [sic] in my office about 8:30 this morning informing her that he was still sick, and would be unable to attend court. I am not here to ask that these proceedings be suspended for Mr. Morrison to get himself here voluntarily.

However, I would ask the Court to issue a body attachment forthwith to produce the body of Mr. Morrison. I believe him to be at his home. I have a detective standing by to offer assistance. He has been to the residence, and knows exactly where it is.

I have no other witnesses, of course, he [is] my final witness.

Counsel for both parties then briefly debated the procedural practicality of issuing a body attachment, since Morrison lived in Alexandria, Virginia, and wasn't directly subject to the Maryland court's jurisdiction[2]. Following this debate, the court proceeded to order a body attachment on Mr. Morrison. Shortly thereafter, the defense called—out of turn (since the final witness for the State, *i.e.*, Morrison, hadn't yet been called)—two witnesses, Wilfred Jerome Acosta and Rajid Zamani.

The record reflects that on February 19 and 20, 1992 the Montgomery County Police Department, in a joint effort with the Alexandria (Virginia) Police Department, failed to find Mr. Morrison or to ascertain his whereabouts.[3] As a result, when trial recommenced on February 20, the State—

---

2. It was at this point that counsel for the State raised, for the first time, vague allegations that "there are serious suggestions with witness tampering in this case [vis-a-vis Mr. Morrison]."

3. Testimony indicated that (1) Morrison had falsely informed his employer that he had been in court every day since February 12 (*i.e.*, the first day of trial), when in fact he had been present only the first two days of trial and had been absent from trial since February 14, inclusive; and (2) Morrison had apparently left his residence for the last time on the morning of February 19th, having falsely given his then roommate the impression that he was on his way to court.

having been effectively denied its "key witness"—moved for a mistrial on the grounds of manifest necessity. In *granting* the mistrial, the court reasoned as follows:

I have considered the arguments of counsel on this question, and what I have to do is make a determination as to whether or not this is truly an instance of manifest necessity.

It is clear from the record that the witness who is not present, the prosecution's witness, is not present, Mr. Morrison, but he was summoned. He was notified to appear in court.

He made commitments, apparently to the State's attorney, but he also made verbal commitments to the Court by way of telephone with both counsel present that his illness prevented him from attending the first day, but he indicated that he would surely be here the second day.

The second day he was not here—second day or the first day beyond his anticipated appearance. We are now into the third day, and the record is replete with the indication that the State has exerted every effort to get assistance of the Virginia authorities without successes as late as 7:30 or approximately 7:30 this morning.

There is not a wealth of law with respect to manifest necessity, but the Court is not totally without resources. I have looked at the case of *Illinois v. Somerville,* 410 U.S.[ ] 458, [93 S.Ct. 1066, 35 L.Ed.2d 425] [ (1973) ].

In brief, that case simply indicates that manifest necessity is a legitimate reason or can be a legitimate reason for declaring a mistrial even over defendant's objections provided that there is some basis for the court's determination.

The court's record indicates that the determination reflects a rational or is reflective—that the Court is satisfied on the record and offers a rational determination for granting the relief prayed by the government.

It says, "Pursuant to the ends of public justice." This obviously arises in instances of double jeopardy, where it

**40**

gets up to the Supreme Court on a double jeopardy basis, and in this case, this case being *Illinois v. Somerville,* the declaration was considered to be allowable, that there was no double jeopardy.

Again, the court held that the end of public justice would be defeated. *Mr. Morrison's non-appearance is not because of any action or inaction on the part of the prosecution.*

He did in fact appear in this courthouse on the first two days of trial or at least he appeared twice after the trial had commenced. So, his absence is not because the State did not pursue every reasonable recourse available to it.

*Ordinarily, absence of a witness and nothing more would not justify the granting of a mistrial on the State's motion on the basis of manifest necessity,* and that is essentially what the court held in *Downum [v. United States,* 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963)] in which the State elected to proceed to trial knowing that the witness was not available, but simply taking a chance that he would be by the time that witness would be called to testify.

Ultimately, that witness was not available, and the assertion on the part of the prosecution was manifest necessity because of non-availability of the witness. The court looked at the record, felt that this was a tactic determination and the government took a chance that the witness would be available; therefore, that chance should not inure to the detriment of the defendant. * * *

But that is not the kind of case that we have here. *The State did everything it could to get the witness here. The State took every precaution, did not take a chance, but had reason to believe that the witness would testify both on the conversations had with [sic] the witness.*

The Court is satisfied that such was the case based on my conversation with Mr. Morrison with counsel present. I do think that in the interest of public justice the State of

Maryland should be fairly entitled to pursue this matter to a legal conclusion.

I think the defendant is also entitled to a legal conclusion in this case either confirming his innocence or his guilt. This delay I am sure has cost the defendant, and it has cost the State, but it is unresolved owing not to anything done or undone by the prosecution.

*And even though it is over objection, I find that based on the record in this case that there was manifest necessity.* I am going to declare it in this trial. I think it would be burdensome and unfair to the jurors to have this matter linger and them not knowing when the day of trial would be.

*I don't think any assurances from Mr. Morrison at this point would even justify continuing this matter further.* There is no reasonable likelihood that he is going to appear. He hasn't done so far today irrespective of his representations.

(Emphasis added.)

Later that day (February 20th), the court set as its new trial date April 20, 1992. Two weeks later (*i.e.*, on March 5, 1992), appellant filed a "Motion to Dismiss Indictment on Grounds of Double Jeopardy," and pursuant thereto the court held a hearing on the motion on April 10, 1992. Following the hearing, the court, speaking from the bench, denied appellant's motion:

I have entertained again the argument of counsel and considered the testimony of the witnesses that testified today [4], and I see no reason compelling or otherwise for the Court to come to the conclusion that its declaration of a mistrial in this case was not justified by the circumstances.

---

**4.** Four witnesses testified at the hearing: (1) Diana Dean, a witness/victim coordinator in the State's Attorney's office, (2) Mark Marino, the general manager of the Hardee's, (3) Constance Hughes, defense counsel's legal secretary, and (4) Scott S. Lipson, defense counsel's law clerk.

That it did constitute manifest necessity, and therefore, it will not be disturbed, your motion to dismiss will be denied.

(Footnote added.)

This timely appeal followed, in which appellant has asked us to address the questions first presented above.

## II.

The Fifth Amendment to the Constitution of the United States reads, in relevant part, as follows: "[No person] shall ... be subject for the same offence to be twice put in jeopardy of life or limb." This clause (hereinafter, the "Double Jeopardy Clause") applies to prosecutions for all crimes, whether they be federal (*see, e.g., Ex Parte Lange,* 85 U.S. (18 Wall.) 163, 21 L.Ed. 872 (1873)) or state (*see, e.g., Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969) [5]) in nature. In any event, in all cases tried by jury, jeopardy is said to "attach" when the jury is impaneled and sworn.

In reaching our decision herein, there are several significant United States Supreme Court and Maryland state cases, as well as several notable lower federal decisions, which light our way.

In *Somerville, supra,* respondent was indicted by an Illinois grand jury for the crime of theft. After a petit jury had been impaneled and sworn, *but before any evidence had been presented,* the prosecuting attorney realized that the indictment was substantively—and fatally—deficient. Amendment was not possible under Illinois law then existing, and therefore, after determining that further proceedings under this defective indictment would be useless, the trial court declared a mistrial. Two days later the grand jury handed down a second indictment, identical to the first

---

5. "The double jeopardy prohibition of the Fifth Amendment represents a fundamental ideal in our constitutional heritage, and ... it ... appl[ies] to the States through the Fourteenth Amendment." *Benton,* 395 U.S. at 794, 89 S.Ct. at 2062.

except that the substantive defect had been corrected. Following arraignment, respondent raised the claim of double jeopardy, which the trial court overruled. Eventually the case, and the double jeopardy issue, wound up in the Supreme Court of the United States (which affirmed the declaration of mistrial and subsequent retrial). We quote at length from Justice (now Chief Justice) Rehnquist's informative opinion:

The fountainhead decision construing the Double Jeopardy Clause in the context of a declaration of a mistrial over a defendant's objection is *United States v. Perez,* 9 Wheat. 579 [6 L.Ed. 165] (1824). Mr. Justice Story, writing for a unanimous Court, set forth the standards for determining whether a retrial, following a declaration of a mistrial over a defendant's objection, constitutes double jeopardy within the meaning of the Fifth Amendment. In holding that the failure of the jury to agree on a verdict of either acquittal or conviction did not bar retrial of the defendant, Mr. Justice Story wrote:

"We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, *taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated.* They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes. * * * But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rest, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office." *Id.* [9 Wheat] at 580.

(*Somerville,* 410 U.S. at 461, 93 S.Ct. at 1069; emphasis added.)

Justice Rehnquist then stated that the Court had consistently renounced the application of any mechanical formula by which to judge the propriety of declaring a mistrial "in the varying and often unique situations arising during the course of a criminal trial." *Id.* at 462, 93 S.Ct. at 1069. Instead, the Court focused on the great "breadth of a trial judge's discretion, and the reasons therefor, to declare a mistrial":

> Where, for reasons deemed compelling by the trial judge, who is best situated intelligently to make such a decision, the ends of substantial justice cannot be attained without discontinuing the trial, a mistrial may be declared without the defendant's consent and even over his objection, and he may be retried consistently with the Fifth Amendment.

*Id.* (*quoting Gori v. United States,* 367 U.S. 364, 368, 81 S.Ct. 1523, 1526, 6 L.Ed.2d 901 (1961)).

Justice Rehnquist then briefly discussed a number of Supreme Court cases in which the declaration of a mistrial had been upheld [6], before summarizing the general state of the law:

> While virtually all of the cases turn on the particular facts and thus escape meaningful categorization, it is possible to distill from them a general approach, premised on the "public justice" policy enunciated in *United States v. Perez,* to situations such as that presented by this case. *A trial judge properly exercises his discretion to declare a mistrial if an impartial verdict cannot be*

---

6. *For example, Perez, supra,* and *Logan v. United States,* 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429 (1892) (where juries were unable to reach verdicts); *Simmons v. United States,* 142 U.S. 148, 12 S.Ct. 171, 35 L.Ed. 968 (1891) (one of the jurors had been acquainted with the defendant, and, therefore, was probably prejudiced against the Government); *Thompson v. United States,* 155 U.S. 271, 15 S.Ct. 73, 39 L.Ed. 146 (1894) (one of petit jurors had been member of the grand jury that indicted the defendant); *Lovato v. New Mexico,* 242 U.S. 199, 37 S.Ct. 107, 61 L.Ed. 244 (1916) (defendant had not pleaded to the indictment after his demurrer had been overruled).

*reached, or if a verdict of conviction could be reached but would have to be reversed on appeal due to an obvious procedural error in the trial.* If an error would make reversal on appeal a certainty, it would not serve "the ends of public justice" to require that the Government proceed with its proof when, if it succeeded before the jury, it would automatically be stripped of that success by an appellate court. * * * While the declaration of a mistrial on the basis of a rule or a defective procedure that would lend itself to prosecutorial manipulation would involve an entirely different question, cf. *Downum v. United States, supra,* such was not the situation in the above cases or in the instant case.

*Id.* 410 U.S. at 464, 93 S.Ct. at 1070 (citations omitted, emphasis added).

The *Downum* case is closer—factually speaking—to the case at bar than is *Somerville.* In *Downum,* the petitioner (along with three others) was charged in an indictment containing eight counts. On the day of trial, shortly after the jury was selected and sworn, but before any testimony was taken, the prosecution asked that the jury be discharged because its "key witness" as to two of the counts was not then present. The court granted the prosecution's request. Two days later when the case was called again and a second jury impaneled, petitioner pleaded double jeopardy, which plea was overruled by the trial court. Following retrial, petitioner was found guilty and, subsequently, he appealed his way to the Supreme Court. The Supreme Court reversed the trial court, thereby determining that, *under the circumstances of that case,* the double jeopardy plea should have been sustained. In so deciding, Justice Douglas, speaking for the Court, stated:

At times the valued right of a defendant to have his trial completed by the particular tribunal summoned to sit in judgment on him may be subordinated to the public interest—when there is an imperious necessity to do so. *Wade v. Hunter,* [336 U.S. 684,] 690 [69 S.Ct. 834, 837, 93 L.Ed. 974] [ (1949) ]. Differences have arisen as to the

46

application of the principle. See *Brock v. North Carolina*, 344 U.S. 424 [73 S.Ct. 349, 97 L.Ed. 456] [ (1953) ]; *Green v. United States*, 355 U.S. 184, 188 [78 S.Ct. 221, 223, 2 L.Ed.2d 199] [ (1957) ]. Harassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict are examples when jeopardy attaches. *Gori v. United States, supra*, [367 U.S. at] 369 [81 S.Ct. at 1526.] But those extreme cases do not mark the limits of the guarantee. The discretion to discharge the jury before it has reached a verdict is to be exercised "only in very extraordinary and striking circumstances," to use the words of Mr. Justice Story in *United States v. Coolidge*, 25 Fed.Cas. 622, 623 [ (D.Mass.1815) ]. For the prohibition of the Double Jeopardy Clause is "not against being twice but against being twice put in jeopardy." *United States v. Ball*, 163 U.S. 662, 669 [16 S.Ct. 1192, 1194, 41 L.Ed. 300] [ (1896) ].

*Downum*, 372 U.S. at 736, 83 S.Ct. at 1034.

*Downum* is similar, in one respect, to the case *sub judice* in that, in both cases, the absence of the prosecution's key witness formed the basis of the mistrial declaration. In *Downum*, however, *unlike* the case *sub judice*, the prosecution *knew* about the key witness's absence *before the first jury was impaneled and sworn (i.e., before jeopardy has attached )*. In fact it was this distinction—that is, the prosecution's knowledge about the absence of its witness *before jeopardy attached*—on which the case turned. As the Court noted:

Here, as in *Wade v. Hunter, supra*, [336 U.S. at] 691 [69 S.Ct. at 838], *we refuse to say that the absence of witnesses "can never justify discontinuance of a trial."* *Each case must turn on its facts.* On this record, however, we think what was said in *Cornero v. United States*, [48 F.2d 69 (9th Cir.1931) ] states the governing principle * * * *:

"*The fact is that, when the district attorney impaneled the jury without first ascertaining whether or*

*not his witnesses were present, he took a chance.*
While their absence might have justified a continuance
of the case in view of the fact that they were under
bond to appear at that time and place, the question
presented here is entirely different from that involved
in the exercise of the sound discretion of the trial court
in granting a continuance in furtherance of justice.
The situation presented is simply one where the district
attorney *entered upon the trial of the case without
sufficient evidence to convict.* This does not take the
case out of the rule with reference to former jeopardy.
There is no difference in principle between a discovery
by the district attorney immediately after the jury was
impaneled that his evidence was insufficient and a
discovery after he had called some or all of his witness-
es." 48 F.2d, at 71.

That view, which has some support in the authorities, is
in our view the correct one. We resolve any doubt "in
favor of the liberty of the citizen, rather than exercise
what would be an unlimited, uncertain, and arbitrary
judicial discretion."

*Downum,* 372 U.S. at 737–38, 83 S.Ct. at 1035 (emphasis
added; footnotes omitted). Indeed, the *Cornero* case, quot-
ed in *Downum* above, *expressly* set forth the principle that
guided the decision in *Downum,*

The ... *mere* absence of witness *discovered after the
jury is impaneled* is insufficient to deprive the accused
of his right to claim former jeopardy upon a subsequent
trial where the jury is discharged without his consent and
notwithstanding his objection.

*Cornero,* 48 F.2d at 73 (emphasis added).

Moreover, in a footnote that immediately followed the
above-quoted text in *Downum,* the Supreme Court quoted
*United States v. Watson,* 3 Ben. 1, 28 Fed.Cas. 499, Fed.
Case No. 16,651 (S.D.N.Y.1868), as standing for the proposi-
tion that the proper inquiry (vis-a-vis "manifest necessity")
focuses on the relationship between, on the one hand, the

*timing* of the activity that allegedly constitutes the manifest necessity, and, on the other hand, the activity itself:

> The illness of the district attorney [that caused the alleged manifest necessity in *Watson* ], *it not appearing by the minutes that such illness occurred after the jury was sworn,* . . . cannot be regarded as creating a manifest necessity[.]

*Downum,* 372 U.S. at 738, 83 S.Ct. at 1036 (*quoting Watson,* 28 Fed.Cas. at 500–01).

In *Arizona v. Washington,* 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978), the Supreme Court also dealt with the issue of manifest necessity in the context of potential juror bias. There, the trial judge granted the prosecutor's motion for a mistrial predicated on an allegedly improper and prejudicial comment made by defense counsel during the defense's opening statement. The trial judge, however, neither expressly found that there was "manifest necessity" for a mistrial, nor expressly stated that he had considered alternative solutions. (In contrast, the trial judge in the case *sub judice* did *both*—*i.e.,* he found that there was manifest necessity for a mistrial *and* he expressly considered alternative solutions, including continuance.) *Nevertheless, the Supreme Court acknowledged the high degree of deference given to a trial judge's decision to grant a mistrial, and accordingly permitted the trial court's determination to stand.* Justice Stevens, writing for the court, noted the following caveat, however [7]:

> Our conclusion that a trial judge's decision to declare a mistrial based on his assessment of the prejudicial impact

---

7. Procedurally, the Arizona Supreme Court refused to review the lower court's mistrial determination. Accordingly, the respondent sought habeas corpus relief from the United States District Court for the District of Arizona, which granted respondent's writ. The United States Circuit Court of Appeals for the Ninth Circuit *affirmed* the district court, and thereby determined that—under the circumstances presented in the case—retrial would be *unconstitutional.* The State of Arizona subsequently sought review in the Supreme Court, which *reversed* the Ninth Circuit, and thereby "reinstated" the mistrial determination.

... is entitled to great deference does not, of course, end the inquiry. As noted earlier, a constitutionally protected interest is inevitably affected by any mistrial decision. The trial judge, therefore, "must always temper the decision whether or not to abort the trial by *considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate.*" *United States v. Jorn,* 400 U.S. [470] at 486 [91 S.Ct. 547 at 558, 27 L.Ed.2d 543 (1971)] (Harlan, J.). In order to ensure that this interest is adequately protected, reviewing courts have an obligation to satisfy themselves that, in the words of Mr. Justice Story, the trial judge exercised "sound discretion" in declaring a mistrial.

 *Thus, if a trial judge acts irrationally or irresponsibly, his action cannot be condoned.* * * *

*Arizona,* 434 U.S. at 514, 98 S.Ct. at 834–835 (emphasis added).

*Oregon v. Kennedy,* 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), is also relevant to the disposition of the case *sub judice.* In *Oregon,* the respondent was charged with theft of an oriental rug. On redirect examination, the State sought to question an expert witness as to his business dealings with the respondent. During this line of questioning, the following colloquy ensued:

 Prosecutor: Have you ever done business with the [respondent's company]?

 Witness: No, I have not.

 Prosecutor: Is that because he is a crook?

The trial court then granted respondent's motion for a mistrial. *Id.* at 669, 102 S.Ct. at 2086. The State subsequently sought to retry the respondent, who accordingly moved to dismiss the refiled charges on the basis of double jeopardy. Justice Rehnquist, writing for the Supreme Court (as he did in *Somerville, supra,* and *Richardson, infra*), *permitted* the retrial. In so holding, the Court

focused on the *intent* of the prosecutor in generating the activities that justified the mistrial declaration:

> Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, therefore, does not bar retrial *absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause.*

*Id.* at 675–76, 102 S.Ct. at 2089.

Indeed, constitutional criminal law scholars Charles H. Whitebread and Christopher Slobogin summarized the *Oregon* holding as follows:

> In *Oregon v. Kennedy* the Court [held] that merely negligent prosecutorial action resulting in mistrial will not bar retrial even when the defense does not contribute to the mistrial order.

C. Whitebread & C. Slobogin, *Criminal Procedure* 737 (2nd ed. 1986). (In the instant case, of course, it is questionable as to whether or not the State's actions even rose to the level of negligence.)

Perhaps the most recent case in which the Supreme Court dealt with the issue at bar was *Richardson v. United States,* 468 U.S. 317, 104 S.Ct. 3081, 82 L.Ed.2d 242 (1984). In *Richardson,* the petitioner was acquitted of one federal controlled dangerous substance violation, but the jury was unable to reach a verdict as to two remaining counts. The United States District Court for the District of Columbia declared a mistrial as to those two counts, and petitioner accordingly argued *inter alia* that retrial would be barred by the Double Jeopardy Clause [8]. The Court, however, rejected his Double Jeopardy argument.

---

**8.** The primary issue in *Richardson,* however, concerned the appealability of the District Court's ruling on petitioner's motion for judgment of acquittal based on the insufficiency of the evidence (which motion was renewed by petitioner at the same time that he made his Double Jeopardy argument). Thus, to reach the Double Jeopardy issue, the Supreme Court first had to (and, indeed, *did* ) determine that—under

In permitting the petitioner to be retried, Justice Rehnquist (who also authored *Somerville* and *Oregon, supra,* as aforementioned) quoted at length from *Wade, supra:*

"The double-jeopardy provision of the Fifth Amendment, however, does not mean that every time a defendant is put to trial before a competent tribunal he is entitled to go free if the trial fails to end in a final judgment. Such a rule would create an insuperable obstacle to the administration of justice in many cases in which there is no semblance of the type of oppressive practices at which the double-jeopardy prohibition is aimed. *There may be unforeseeable circumstances that arise during a trial making its completion impossible, such as the failure of a jury to agree on a verdict. In such event, the purpose of law to protect society from those guilty of crimes frequently would be frustrated by denying courts power to put the defendant to trial again. . . .* What has been said is enough to show that a defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments."

*Richardson,* 468 U.S. at 324–25, 104 S.Ct. at 3085–86 (*quoting Wade,* 336 U.S. at 688–89, 69 S.Ct. at 837) (emphasis added).

The Court then set forth the critical language that greatly assists us in resolving the case *sub judice:*

*[T]he protection of the Double Jeopardy Clause by its terms applies only if there has been some event, such as an acquittal, which terminates the original jeopardy.* Since jeopardy attached here when the jury was sworn, petitioner's argument necessarily assumes that the judicial declaration of a mistrial was an event which terminat-

---

the circumstances present in the case—petitioner had raised a colorable Double Jeopardy claim.

ed jeopardy in his case and which allowed him to assert a valid claim of double jeopardy.

But this proposition is irreconcilable with cases such as *Perez[, supra,]* and *Logan[ v. United States,* 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429 (1892) ], and we hold on the authority of these cases that the failure of the jury to reach a verdict is not an event which terminates jeopardy. *Our holding in Burks[ v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) ] established only that an appellate court's finding of insufficient evidence to convict on appeal from a judgment of conviction is for double jeopardy purposes, the equivalent of an acquittal.[9]* * * * *The Government, like the defendant, is entitled to resolution of the case by verdict from the jury[.]*

*Richardson,* 468 U.S. at 325–26, 104 S.Ct. at 3086 (footnote in original; emphasis added).

Maryland state courts have also had occasion to discuss a trial judge's discretion to declare a mistrial. Two significant cases in this regard are *Cornish v. State,* 272 Md. 312, 322 A.2d 880 (1974), and *In re Mark R.,* 294 Md. 244, 449 A.2d 393 (1982).

The issue before the Court of Appeals in *Cornish* was phrased by Judge Eldridge (writing for the Court) in the following manner:

The single issue before us is whether, *under the particular circumstances of this criminal case,* the retrial of the defendant-appellant following the trial judge's *sua sponte* declaration of a mistrial would violate the double jeopardy

---

**9.** A trial court's finding of insufficient evidence also is the equivalent of an acquittal, see *Hudson v. Louisiana,* 450 U.S. 40, 44–45, n. 5, 101 S.Ct. 970, 972–973, n. 5, 67 L.Ed.2d 30 (1981), but *Burks* was not necessary to establish that principle. See *Burks v. United States,* 437 U.S., at 11, 98 S.Ct. at 2147, citing *Fong Foo v. United States,* 369 U.S. 141, 82 S.Ct. 671, 7 L.Ed.2d 629 (1962); *Kepner v. United States,* 195 U.S. 100, 24 S.Ct. 797, 49 L.Ed. 114 (1904).

prohibition of the Fifth Amendment to the United States Constitution.

*Cornish,* 272 Md. at 313, 322 A.2d 880.

The "particular circumstances" involved in *Cornish* may be summarized briefly. After appellant was indicted, a jury trial on the merits was postponed *twice* because of the State's lack of witnesses. When trial finally commenced, but before the jury was selected, defense counsel called to the court's attention the fact that the State still hadn't responded to a defense discovery motion. Consequently, the trial was temporarily recessed. When trial resumed, the appellant (then, defendant) withdrew his request for a jury trial, and elected instead to be tried by the court. The State then presented its first (and, as it turned out, its only) witness. After this witness testified, there arose an issue as to whether or not the parties had agreed to proceed on a guilty plea or a not guilty plea on an agreed statement of facts. The Court of Appeals described what occurred next:

> After a lengthy discussion among the prosecuting attorney, the defense attorney and the [trial] court on the matter of a continuance, on the failure of the State to answer the discovery motion, and on the admissibility of the defendant's statement [made to the police], the trial judge sustained the objection of defendant as to the admissibility of the statement. The State again requested a continuance, and the trial judge initially indicated a willingness to continue the case while stating that "better judgment, frankly, would dictate the granting of a mistrial." The defendant's attorney objected to the continuance and moved for a dismissal of the charges on the grounds that Cornish had been denied his right to a speedy trial and that "he is now in jeopardy." The trial judge then denied the defendant's motion for a dismissal, denied the State's motion for a continuance, and declared a mistrial.

*Cornish, id.* at 314–15, 322 A.2d 880.

In reversing the trial court's declaration, the Court of Appeals reviewed the law concerning mistrials:

[R]etrial of the defendant following mistrial has been held to be prohibited by the double jeopardy clause where the mistrial was declared because of the absence of the prosecution's witnesses, *Downum v. United States, supra; United States v. Watson*, [*supra*]; *Commonwealth v. Ferguson*, 446 Pa. 24, 285 A.2d 189 (1971); *but cf. United States ex rel. Gibson v. Ziegele*, 479 F.2d 773 (3rd Cir.1973) *cert. denied* 414 U.S. 1008, 94 S.Ct. 370, 38 L.Ed.2d 246 (1973). In an opinion by Mr. Justice McLean, the Fifth Amendment was held to prohibit a retrial where the mistrial was declared after the prosecuting attorney attempted to have a *nolle prosequi* entered because the prosecution's evidence was insufficient, *United States v. Shoemaker* [27 Fed.Cas. 1067 (C.C.Ill.1840) ]. A retrial was prohibited where the district attorney was ill, and there was no showing that one of his assistants could not have taken over. Re-prosecution is not permitted where a mistrial is declared "so as to afford the prosecution a more favorable opportunity to convict," *Downum v. United States, supra.* Where the effect of a mistrial is "[h]arassment of an accused by successive prosecutions," a retrial is barred. A second trial was not allowed where the trial judge declared a mistrial because continuation of the trial was not consistent with the court's convenience. And a retrial is barred by the Fifth Amendment where reasonable alternatives to a mistrial, such as a continuance, are feasible and could cure the problem.

*Cornish*, 272 Md. at 319–20, 322 A.2d 880 (other citations omitted).

The facts involved in *In re Mark*, the other above-cited Maryland case, may be summarized as follows: appellant was charged in the Circuit Court for Baltimore City with being a delinquent child. At an adjudicatory hearing before a juvenile master, the State put on two witnesses—a police officer, and the alleged victim, one Eu Ja Lee. During cross-examination of Ms. Lee by appellant's attorney, the juvenile master, *sua sponte*, declared a mistrial on the grounds "that Ms. Lee did not have a satisfactory compre-

hension and ability to communicate in the English language." *Mark,* 294 Md. at 246, 449 A.2d 393. The Court of Appeals, in reversing the trial court's decision, determined that—*under the facts and circumstances presented in that case*—there was *not* a manifest necessity to declare a mistrial.

The primary issue on appeal in *Mark* concerned whether the double jeopardy principle was applicable to juvenile adjudicatory hearings, which, of course, is an issue having no direct bearing on the case *sub judice.* Nevertheless, in *Mark,* the Court of Appeals found an opportunity to discuss further the burden on a trial court in "justifying [a] mistrial." *Id.* at 262, 449 A.2d 393. In so holding, the Court noted,

the cases clearly establish that a deficiency in the prosecution's evidence, whether or not it should have been expected by the prosecutor and whether or not the prosecutor was at fault, **ordinarily** does not constitute "manifest necessity" justifying an unconsented mistrial. *See, e.g., Downum, supra,* 372 U.S. at 737–738 [83 S.Ct. at 1035–1036] (prosecution witness absent); *United States v. Anderson,* 509 F.2d 312 (D.C.Cir.1974), *cert. denied,* 420 U.S. 991, 95 S.Ct. 1427, 43 L.Ed.2d 672 (1975) (refusal of prosecution witness to testify); *McNeal v. Hollowell,* 481 F.2d 1145 (5th Cir.1973), *cert. denied,* 415 U.S. 951, 94 S.Ct. 1476, 39 L.Ed.2d 567 (unexpected testimony of one prosecution witness and another prosecution witness unexpectedly invoking the privilege against self-incrimination); *Cornero v. United States,* [*supra,*] (unexpected absence of two prosecution witnesses); *Mizell v. Attorney General of State of N.Y.,* 442 F. Supp. 868 (E.D.N.Y. 1977), *cert. denied,* 440 U.S. 967, 99 S.Ct. 1519, 59 L.Ed.2d 783 (witnesses unavailable); *District of Columbia v. I.P.,* [335 A.2d 224, 226 (D.C.1975)] (because of testimony during cross-examination of prosecution's witness during juvenile adjudicatory hearing, court believed that prosecution was "trying to hide something"); *Fonseca v. Judges of Family Court of Co. of Kings,* [59

Misc.2d 492, 299 N.Y.S.2d 493, 498 (1969)] (unexpected deficiency in police officer's testimony during juvenile adjudicatory hearing); *Tolliver v. Judges of Family Court,* [59 Misc.2d 104, 298 N.Y.S.2d 237, 239 (1969)] (failure of prosecution witness to respond to subpoena and testify at juvenile adjudicatory hearing); *Commonwealth v. Ferguson,* 446 Pa. 24, 285 A.2d 189 (1971) (illness of prosecution witness); *Ex parte Myers,* 618 S.W.2d 365 (Tex.Cr.1981), *cert. denied,* 454 U.S. 1091, 102 S.Ct. 656, 70 L.Ed.2d 630 (1981) (unforeseen change in expected testimony of victim).

*Mark,* 294 Md. at 262–63, 449 A.2d 393 (emphasis added).

Perhaps the most relevant language in *Mark* is the significant use of the emphasized word "ordinarily," *i.e.,* "a deficiency in the prosecution's evidence ... *ordinarily* does not constitute 'manifest necessity' justifying an unconsented mistrial." *Id.* at 262, 449 A.2d 393. The use of the word "ordinarily" makes clear the fact that, under some circumstances, a deficiency in the prosecution's evidence *may* constitute "manifest necessity" justifying an unconsented mistrial. Indeed, the fact that the absence of witnesses *may* justify a mistrial was *expressly* stated in several of the Supreme Court cases cited in *Mark.*[10] *See, e.g., Downum,* 372 U.S. at 737, 83 S.Ct. at 1035 ("[W]e refuse to say that the absence of witnesses 'can never justify discontinuance of a trial.' Each case must turn on its facts."). *See also Wade,* 336 U.S. at 691, 69 S.Ct. at 838. The question raised by the case *sub judice* is, quite simply, when *might* such a deficiency constitute "manifest necessity"?

■ From *Cornero* and *Downum,* both *supra,* we learn that, where the prosecution goes forward with a trial (and permits jeopardy to attach) *knowing in advance of its key witness's absence,* that, for double jeopardy purposes, is the equivalent of an acquittal. *Downum,* 372 U.S. at 737, 83 S.Ct. at 1035 (*quoting Cornero,* 48 F.2d at 71). *See also*

---

**10.** We have thoroughly reviewed each of the cases cited in *Mark* and find each to be legally or factually distinguishable from the case at bar.

*Richardson,* 468 U.S. at 325–26, 104 S.Ct. at 3086–87. *Accord Hudson v. Louisiana, supra,* 450 U.S. at 44–45 n. 5, 101 S.Ct. at 972–973 n. 5 (a trial court's express finding of insufficient evidence also is the equivalent of an acquittal). In the case *sub judice,* however, it is clear that the prosecution did not know of its key witness's absence until *after* jeopardy had attached. Therefore, neither *Cornero,* nor its progeny, is dispositive of the case at bar.

Nevertheless, while not dispositive of the present case, *Cornero* has led several other federal courts to further explain the circumstances under which the absence of a prosecution witness may constitute "manifest necessity." The most recent case to consider the relevant issue in *Cornero* was *United States v. Gallagher,* 743 F.Supp. 745 (D.Ore.1990). The facts in *Gallagher* are, in significant ways, very similar to the case at bar. In *Gallagher,* the defendant was charged with the crimes of conspiracy, arson, and mail fraud, all stemming from a fire that destroyed a local restaurant owned by defendant. The State's case focused on the testimony of one Roger Wayne McLaughlin, who, the State alleged, was hired by the defendant to burn down the restaurant so that the defendant could collect on various insurance policies. As in the case *sub judice,* both sides focused their opening statements on the significance of the subject witness's testimony. There was no question, in the minds of all involved, that McLaughlin was expected to testify and that his testimony would make or break the case. Eventually, abruptly and unexpectedly, however, this key government witness took the stand and volunteered that he was a liar, and, subsequent to this admission, refused to answer further questions, thereby rendering himself and his testimony essentially unavailable. Shortly thereafter, and predicated on the "absence" of the testimony of its key witness, the government moved for a mistrial, which was accordingly declared. The issue, as it is here, was whether the mistrial declaration barred retrial. The court found "manifest necessity" and that retrial was not barred.

The United States District Court for the District of Oregon began by summarizing the governing precedent, most of which we have mentioned here, including *Perez, Wade, Cornero, Downum,* and *Jorn,* all *supra.* The district court's discussion of *Cornero* is especially relevant:

> The Ninth Circuit reviewed the cases decided under the doctrine of manifest necessity and held that *"mere* absence of witnesses discovered after the jury is impaneled is insufficient to deprive the accused of his right to claim former jeopardy upon a subsequent trial where the jury is discharged without his consent and notwithstanding his objection." 48 F.2d at 73. The Supreme Court later disapproved this "rigid formula," stating that the principles of *Perez* command courts to take all circumstances into account and "thereby forbid the mechanical application of an abstract formula." *Wade, supra,* 336 U.S. at 691, 69 S.Ct. at 838.

*Gallagher,* 743 F.Supp. at 747 (emphasis added).

The court then went on to discuss two circuit court of appeals cases that, when presented with facts similar to those in *Gallagher* (and, by extension, similar to those in the case *sub judice*), *found* manifest necessity where a witness was unavailable and where there was no fault on the part of the prosecution: *United States ex rel. Gibson v. Ziegele, supra,* and *United States v. Shaw,* 812 F.2d 1182 (9th Cir.1987), *cert. denied,* 485 U.S. 1022, 108 S.Ct. 1577, 99 L.Ed.2d 892 (1988).

In *Ziegele,* the defendant was being tried for "murder and atrocious assault and battery." 479 F.2d at 775. After several prosecution witnesses had testified, the prosecution was prepared to call its key witness—Captain Wilson, of the Atlantic City Police Department. Unfortunately, Captain Wilson had contracted "an intestinal grippe with acute coronary insufficiency" and was thus rendered unable to testify for several weeks. The prosecution accordingly moved for a mistrial, which the defense resisted on the ground that "the absence of one witness was not enough to justify a mistrial[.]" *Id.* After considerable discussion

between the parties, the trial judge eventually declared the requested mistrial. It was the propriety of this declaration that came before the Circuit Court of Appeals for the Third Circuit.

In affirming the trial court's declaration, Judge Hunter, writing for the Third Circuit, analyzed the same precedential caselaw as discussed above, including *Jorn, Somerville, Perez*, and *Wade*, all *supra*. Following this analysis, the court's holding was as simple as it was relevant to the case *sub judice:*

> Applying the standard of 'manifest necessity' and 'public justice' to the facts in this case, we believe that the trial judge did not abuse his discretion in declaring a mistrial over the defendant's objection after he learned that a key prosecution witness, Captain Wilson, had become ill during the trial and could not testify.

*Ziegele*, 479 F.2d at 777.

In the *Shaw* case, also cited by the court in *Gallagher*, the defendant was tried for, *inter alia*, weapons possession. During the trial the district judge, over defense objection, granted a mistrial predicated on the absence of an important witness for the government whose anticipated testimony had been described in defense counsel's opening statement. On appeal, the defendant argued—much as appellant argues in the case *sub judice*—that there was no manifest necessity for a mistrial, and that retrial was therefore barred by the Double Jeopardy Clause. Again, as in *Ziegele, supra*, the Ninth Circuit's holding accorded great deference to the lower court's discretion:

> Even if "some trial judges might have proceeded with the trial after giving the jury appropriate cautionary instructions," we must accord the highest degree of respect to the trial judge's evaluation of the likelihood of juror bias [based on the remarks made in opening statements]. We therefore hold that the district judge's decision that potential juror bias justified a mistrial under the manifest necessity standard was an exercise of sound discretion,

and that retrial does not violate the double jeopardy clause.

*Shaw,* 812 F.2d at 1188 (*quoting Arizona,* 434 U.S. at 511, 98 S.Ct. at 833).

## III.

The issue in this case, as aforementioned, is whether the trial court's declaration of a mistrial was based on manifest necessity. The primary tension this issue raises is between, on the one hand, the great discretion given to a trial judge to weigh the factors in a given case that might bear on whether to declare a mistrial, and, on the other hand, the valued right—measured in Constitutional proportions—of an accused to have his trial completed by the particular tribunal summoned to sit in judgment of him.

The Court of Appeals's language in *Mark,* while highly relevant, is not dispositive of the case at bar:

> the cases clearly establish that a deficiency in the prosecution's evidence, whether or not it should have been expected by the prosecutor and whether or not the prosecutor was at fault, *ordinarily* does not constitute "manifest necessity" justifying an unconsented mistrial.

*Mark, id.* 294 Md. at 262, 449 A.2d 393.

Indeed, *Mark,* as well as the above-cited Supreme Court and interpretive federal court precedent, leave room—under appropriate circumstances—for a trial judge to declare a mistrial based on the unexpected absence of the State's key witness. The question thus raised herein may be phrased simply: Exactly how much discretion does a trial judge have to grant a mistrial in a case such as the one at bar? The Supreme Court has suggested what may be perhaps best viewed as a sliding scale of discretion. On one end of the scale, when "a prosecutor proceeds to trial *aware* that key witnesses are not available to give testimony and a mistrial is later granted for that reason, a second prosecution is barred." *Arizona v. Washington, supra,* 434 U.S. at 508 n. 24, 98 S.Ct. at 832 n. 24 (*citing Downum, supra*

(emphasis added); *i.e.*, in such a case, the trial court has *no* discretion to grant a mistrial.

 "When the basis for the mistrial is the unavailability of critical prosecution evidence," but the prosecutor has proceeded to trial unaware of that fact, the "strictest scrutiny [11] is appropriate" for reviewing the propriety of the trial court's declaration. *Id.* at 508, 98 S.Ct. at 832. That is, in such a case the trial judge is vested with *limited* discretion to grant a mistrial. The case at bar fits into this second category.

 On the other end of the scale, *i.e.*, "[a]t the other extreme is the mistrial premised upon the trial judge's belief that the jury is unable to reach a verdict, long considered the classic basis for a proper mistrial." *Id.* at 509, 98 S.Ct. at 832. In such cases, the trial court possesses *vast* discretion to declare a mistrial.

 In the case *sub judice*, the witness who was absent was the key prosecution witness; in their respective opening statements, both parties had made extensive reference to this witness's expected testimony, and thus it is reasonable to expect that the absence of this witness would cause unfair jury bias to the State's detriment; the key witness's absence was not caused by—or was not in any way referable to—any acts or omissions on behalf of the State; the key witness's absence was not known to or reasonably expected by the State prior to jeopardy attaching; the trial judge considered alternatives to declaring mistrial, but that none of these alternatives appeared efficacious; and, the trial judge's decision was based on the reasonable belief that both parties were entitled to a legal conclusion in this case, confirming either the guilt or innocence of the appellant. Under these circumstances, after according all proper deference to the lower court's determination, we hold that there existed manifest necessity to declare a mistrial and

---

**11.** Not to be confused with the absolutely unrelated doctrine of "strict scrutiny" applicable in reviewing certain equal protection issues.

that, correspondingly, the trial court acted properly. Judge Beard's thoughtful analysis, *supra*, epitomized the exercise of sound discretion.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.