**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Frank STEVENS, Defendant–**
**Appellant.**

No. 97–2035.

United States Court of Appeals,
Sixth Circuit.

Argued April 20, 1999.

Decided and Filed May 27, 1999.

Edward Wishnow (argued and briefed), Birmingham, Michigan, for Appellant.

Walter I. Kozar (argued and briefed), OFFICE OF THE U.S. ATTORNEY, Detroit, Michigan, for Appellee.

. Before: KENNEDY, SILER, and MOORE, Circuit Judges.

MOORE, J., delivered the opinion of the court, in which SILER, J., joined. KENNEDY, J. (pp. 589–93), delivered a separate dissenting opinion.

KAREN NELSON MOORE, Circuit Judge.

Frank Stevens was indicted for his alleged involvement in the theft of a piece of construction equipment. After the government's key witness against him refused to testify, the district court ordered a mistrial and denied Stevens's motion to dismiss the charges on double jeopardy grounds. Because the government has had one opportunity to convict the defendant, at which it was unable to compel the testimony of its key witness and failed to produce other evidence sufficient to convict, we hold that further prosecution is barred by the Double Jeopardy Clause. We therefore **REVERSE** the decision of the district court.

## I. BACKGROUND

Frank Stevens, Donald Faulkner, and Carlo Bommarito were indicted for stealing a Caterpillar 936E Wheel Loader in violation of 18 U.S.C. §§ 659 (Interstate or foreign shipments by carrier) and 371 (Conspiracy). The indictment alleged that Bommarito and another person, John Pree, stole the Caterpillar at Stevens's urging. Stevens had allegedly selected the Caterpillar to be stolen after meeting with Faulkner, who acted as Stevens's intermediary with the person who bought the stolen equipment, James Sellars.

Pree was the government's key witness against Bommarito, and when Pree announced his refusal to testify the charges against Bommarito were dismissed. The government was also aware that it might have trouble with Frank Pizzo, its key witness against Stevens. Pizzo is Faulkner's brother-in-law. The government had therefore prepared a motion to compel Pizzo's testimony and was also prepared to grant him immunity if necessary to prevent him from asserting his Fifth Amendment privilege.

Stevens and Faulkner went to trial on April 29, 1997. During his opening statement, the prosecutor described the evidence he planned to present. He told the jury that Pizzo would testify about a conversation he had with Stevens at Faulkner's car wash. Stevens allegedly told Pizzo, "Tell Donald [Faulkner] to tell them guys to get that stuff out of there"; Stevens told Pizzo that Faulkner would know what he meant. J.A. at 73 (Prosec. Opening St.). The prosecutor explained that "them" referred to Sellars and an associated construction company and that the "stuff" was the stolen Caterpillar. The defense responded that any such testimony by Pizzo would be "a bold-faced lie." J.A. at 75 (Def. Opening St.).

On May 1, the third day of trial, Pizzo and his attorney informed the court that Pizzo would refuse to testify regardless of whether he was granted immunity. His stated reason was "deep concerns for the welfare of my family." J.A. at 80 (Pizzo Test.). Pizzo never gave a full explanation of his concerns, but his lawyer mentioned a decapitated rodent left at Pizzo's door and telephone threats directed towards him and his father.[1] When called to the stand, Pizzo continued to refuse to testify after

---

1. These incidents apparently occurred several months prior to the trial, around the time of an earlier date for which the trial had been scheduled.

the district court had granted him immunity from prosecution and had explained the consequences of contempt of court.

The court sent Pizzo to jail to reconsider his options and continued the trial until May 6. Pizzo still refused to testify. The government indicated its intent to move for a mistrial, but it decided to wait until the close of the evidence in the hope that Pizzo might yet change his mind. The government finished presenting the rest of its evidence on May 21. Recalled from jail once more, Pizzo still refused to testify.

In the absence of Pizzo's testimony, the government's case against Stevens came down to (1) evidence that Stevens had once rented space in a building near which an earlier illegal transaction between Sellars and Faulkner had occurred and (2) a somewhat incriminating receipt that looked like ones that a witness, Mary Parsley, had typed for Stevens. The government also sought to introduce Pizzo's grand jury testimony, but the district court excluded most of it.

The government conceded that without Pizzo's testimony it did not have sufficient evidence to convict Stevens.[2] It therefore moved for a mistrial on the grounds that Pizzo was unavailable and that the government was prejudiced because it had promised the jury Pizzo's testimony. The government argued that this prejudice could not be cured by a cautionary instruction. The court granted the government's motion and denied Stevens's motion for a judgment of acquittal.

In the course of ruling on the mistrial and on the admissibility of Pizzo's grand jury testimony, the district court considered the issue of whether either party was responsible for Pizzo's "unavailability." Referring to *United States v. Khait,* 643 F.Supp. 605, 609 (S.D.N.Y.1986), which held that there was manifest necessity for a mistrial because there was a "distinct possibility" that the defendant was responsible for a witness's refusal to testify, the district judge said:

> And I'm satisfied regardless of this New York case, that this Court can't make any finding relative to that, and I think that is particularly true and should be noted on the record in the context of everything. I mean, we have had a number of things happen in this case that could point to Mr. Pizzo not testifying for some reason not having to do with either one of these Defendants. I mean, there are just too many other things that have gone on in the case that might point to somebody or something else being a reason for Mr. Pizzo not testifying that doesn't have to do with Mr. Faulkner or Mr. Stevens, and that there just is not enough, there is nothing, I don't think, to show except that him not testifying would be favorable to both.

J.A. at 301. The court also concluded that the government was not responsible in the sense that it had not been negligent in beginning the trial without better assuring itself of Pizzo's testimony.

The trial against Faulkner proceeded, and Stevens filed a motion to dismiss the indictment against him on double jeopardy

---

**2.** Responding to the defense's claim of insufficient evidence, the prosecutor said:

> Well, there is some evidence against his client, Your Honor. The Government is not going to argue that there is evidence that would necessarily sustain a verdict of guilt based on the record as it exists at this moment. If the Jury were to consider it.
> The Government is not going to take the position that there is sufficient evidence at this point in the trial connecting Mr. Stevens to the theft of the Caterpillar wheel loader which is the subject of the indict-

ment and as well as the conspiracy charge of Count 1.
> To make that out, the Government would have sought the introduction of evidence previously noted and the testimony of Mr. Francis Pizzo, and that is the reason why the Government has moved for a mistrial because in his absence there is manifest necessity for granting a mistrial because the government cannot seek any further the case as to Mr. Stevens.

J.A. at 309.

grounds. The court denied the motion, holding that the mistrial was justified by manifest necessity.

## II. JURISDICTION

■ *Abney v. United States,* 431 U.S. 651, 662, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977), held that an order denying a motion to dismiss on double jeopardy grounds is a "final decision" for purposes of 28 U.S.C. § 1291. We therefore have jurisdiction over this interlocutory appeal.

## III. ANALYSIS

■ The Double Jeopardy Clause protects not only the rights against re-trial after an acquittal and against multiple punishments for the same offense but also "a defendant's valued right to have his trial completed by a particular tribunal." *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 93 L.Ed. 974 (1949). "Even if the first trial is not completed, a second prosecution ... increases the financial and emotional burden on the accused, prolongs the period in which he is stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be convicted." *Arizona v. Washington,* 434 U.S. 497, 503–04, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978) (footnotes omitted). When a criminal trial ends in a mistrial, re-prosecution is permitted only if there was "manifest necessity for the [mistrial] or the ends of public justice would otherwise be defeated." *United States v. Perez,* 9 Wheat. 579, 22 U.S. 579, 580, 6 L.Ed. 165 (1824). In this case, the government argues that there was manifest necessity due to unfair prejudice to the government and the refusal of its key witness to testify.

### A. STANDARD OF REVIEW

■ The standard of review for a double jeopardy claim after a mistrial varies according to the issues involved. *See Washington,* 434 U.S. at 510, 98 S.Ct. 824 (discussing "the spectrum of trial problems which may warrant a mistrial and which vary in their amenability to appellate scrutiny"); *Harpster v. Ohio,* 128 F.3d 322, 328 (6th Cir.1997) (explaining that we "apply greater scrutiny in some cases than ... in others"), *cert. denied,* —— U.S. ——, 118 S.Ct. 1044, 140 L.Ed.2d 109 (1998); *United States v. Sisk,* 629 F.2d 1174, 1178–79 (6th Cir.1980), *cert. denied,* 449 U.S. 1084 (1981). The classic situation justifying a mistrial is a hung jury. In deciding at what point further deliberations by a particular jury would be fruitless or unduly coercive, the trial judge has wide discretion. *See Perez,* 22 U.S. at 580; *see also Washington,* 434 U.S. at 509–10, 98 S.Ct. 824. In contrast, "the strictest scrutiny is appropriate when the basis for the mistrial is the unavailability of critical prosecution evidence." *Washington,* 434 U.S. at 508, 98 S.Ct. 824 (citing *Downum v. United States,* 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963), a case involving an unavailable witness). The determination that the jury has been biased by a party's prejudicial remarks lies on the spectrum between these two extremes but is considered "an area where the trial judge's determination is entitled to special respect." *Washington,* 434 U.S. at 510, 98 S.Ct. 824. This seemingly variable standard of review can be seen merely as reflecting the different levels of review for findings of fact and questions of law. *See id.* at 520 n. 1, 98 S.Ct. 824 (Marshall, J., dissenting) (agreeing with majority's standard of review). The appropriate standard of review is determined by whether the underlying reasons for the mistrial concern issues best left to the informed discretion of the trial judge or issues that resemble pure questions of law for which closer appellate review is appropriate.

Here, we apply this flexible standard of review by giving appropriate deference to the district court's determinations about the prejudicial effect of the government's opening statement, in light of its later failure to produce Pizzo, and about whether Stevens was responsible for Pizzo's re-

fusal to testify or the government was negligent in failing to anticipate it. Although the district court discussed both of the government's asserted grounds for a mistrial—unfair prejudice due to its opening statement and the bare fact of its key witness's refusal to testify—the court's decision appears to have rested primarily on the latter. Because the basis for the mistrial and re-prosecution was "the unavailability of critical prosecution evidence," the district court's decision is subject to "the strictest scrutiny." *Washington*, 434 U.S. at 508, 98 S.Ct. 824. We hold that Pizzo's refusal to testify did not create a manifest necessity for a mistrial. We also hold that declaring a mistrial on the basis of the government's claim of unfair prejudice would have been an abuse of discretion.

## B. THE MANIFEST NECESSITY STANDARD

The Supreme Court and the Courts of Appeals have consistently refused to establish categorical rules for when a mistrial is manifestly necessary or required by the ends of public justice. *See Illinois v. Somerville*, 410 U.S. 458, 462, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973); *Harpster*, 128 F.3d at 328. Each case must turn on its own facts. However, the Supreme Court's opinion in *Somerville* outlines a "general approach" that can at least serve as a starting point. The Court held that "[a] trial judge properly exercises his discretion to declare a mistrial if an impartial verdict cannot be reached, or if a verdict of conviction could be reached but would have to be reversed on appeal due to an obvious procedural error in the trial." *Id.* at 464, 93 S.Ct. 1066. These two criteria explain most, but not all, of the circumstances in which federal courts have permitted re-prosecution following a mistrial.

The first category—"an impartial verdict cannot be reached"—includes the classic hung jury as well as cases in which the jury is incurably tainted. For example, in *Arizona v. Washington*, 434 U.S. at 499, 516, 98 S.Ct. 824, the Supreme Court

approved the district court's holding that a mistrial was manifestly necessary after defense counsel told the jury that the prosecutor had intentionally withheld exculpatory evidence in a previous trial. Our decision in *United States v. Cameron*, 953 F.2d 240 (6th Cir.1992), also belongs in this category. There, the trial judge dismissed the jury and recused himself after discovering that several jurors had read a newspaper article calling the judge's integrity into question. The judge thought it would be " 'unseemly to say the least for me to poll this jury as to whether they're going to have any confidence in the Judge.' " *Id.* at 242. This court agreed that the judge acted within his discretion in finding that a mistrial was manifestly necessary. *See id.* at 244.

The second *Somerville* category—"a verdict of conviction could be reached but would have to be reversed on appeal due to an obvious procedural error in the trial"—explains the decision in *Somerville* itself. After the trial had begun, the prosecutor in *Somerville* discovered a defect in the indictment. This defect guaranteed reversal of any conviction. *See Somerville*, 410 U.S. at 460, 93 S.Ct. 1066. In this situation, the ends of public justice require a mistrial rather than a wasteful trial and appellate reversal. Given that a serious error had occurred, the Court asked whether that error guaranteed reversal of any conviction and whether the defendant would then be subject to retrial. As the Court pointed out in a later decision, it would be anomalous to tell trial judges that if they recognize a serious error on the spot the defendant must be set free, while if they refuse to acknowledge an error that is later corrected on appeal the defendant can be retried. *See United States v. Dinitz*, 424 U.S. 600, 610, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976).

While *Somerville* outlined a "general approach" for when a mistrial is manifestly necessary, there is a line of unavailable-witness cases in the lower courts that does not fit neatly under either of the *Somer-*

*ville* criteria. These lower court decisions, and the Supreme Court decisions involving unavailable witnesses, are discussed below.

## C. PREJUDICE

■ In its opening statement, the government told the jury that Pizzo would testify and what it expected him to say. The government's argument that its subsequent failure to produce Pizzo was so prejudicial as to justify a mistrial is meritless.

Most important, whether the jury was incurably prejudiced against the government is irrelevant because as a matter of law the government did not have sufficient evidence to convict. As a matter of law, the jury would have had no choice but to acquit.

Even if the government had enough evidence to convict without Pizzo's testimony, it was not significantly prejudiced by an opening statement which described incriminating evidence that it could not, in fact, produce. Indeed, Stevens could well argue that the government gained an unfair advantage when the prosecutor "testified" to the jury. Any prejudice against the government that would arise from its breaking its promise to produce Pizzo would be too slight to justify a mistrial over the defendant's objection. *Cf. Frazier v. Cupp,* 394 U.S. 731, 735, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); *United States v. Wright–Barker,* 784 F.2d 161, 175 (3d Cir.1986) ("If an opening statement is an objective summary of evidence the government reasonably expects to produce, a subsequent failure in proof will not necessarily result in a mistrial."). Any slight prejudice to the government arising from its failure to produce Pizzo was insufficient to justify a mistrial.

## D. UNAVAILABLE WITNESS

The parties have identified only one case in which the Supreme Court has permitted re-prosecution after a mistrial due to the unavailability of witnesses. *Wade v. Hunter* involved a court-martial held during the American advance into Germany in World War II. Key civilian witnesses were ill during the initial trial, which was continued to await their testimony. Shortly thereafter, the defendant's army division moved to another town, and distance made it impossible for the witnesses to attend further proceedings. Instead, the matter was transferred to another division, where the defendant was convicted. *See Wade,* 336 U.S. at 686–87, 69 S.Ct. 834. The Supreme Court upheld the decision to retry the defendant, rejecting the district court's view that the only reason for dissolving the first court-martial was "to get more witnesses," and characterizing the basis for the discontinuation of the initial trial as required by "the tactical situation brought about by a rapidly advancing army." *Id.* at 691, 69 S.Ct. 834.

In a more typical unavailable-witness case, the Court held that a prosecutor's failure to secure the presence of his witnesses before beginning the trial did not create a manifest necessity for a mistrial. *See Downum,* 372 U.S. at 737, 83 S.Ct. 1033. Although the Court refused to adopt a per se rule that the absence of a witness could never justify a mistrial, it quoted favorably from a lower court opinion that held:

> [W]hen the district attorney impaneled the jury without first ascertaining whether or not his witnesses were present, he took a chance. While their absence might have justified a continuance of the case in view of the fact that they were under bond to appear at that time and place, the question presented here is entirely different from that involved in the exercise of the sound discretion of the trial court in granting a continuance in furtherance of justice. The situation presented is simply one where the district attorney entered upon the trial of the case without sufficient evidence to convict.... There is no difference in principle between a discovery by the district attorney immediately after the jury was impaneled that his evidence

was insufficient and a discovery after he had called some or all of his witnesses. *Id.* at 737–38, 83 S.Ct. 1033 (quoting *Cornero v. United States*, 48 F.2d 69, 71 (9th Cir.1931)).[3]

It is possible to explain the outcomes in *Wade* and *Downum* using *Somerville*'s "general approach." *Wade* was similar to a hung jury case in that the tribunal was rendered unable to complete its proceedings—it was not the witnesses who were absent but the court itself.[4] In *Downum* the court remained capable of producing an impartial verdict; applying *Somerville*'s second criterion, no error had occurred that would guarantee reversal and retrial if there were a conviction. As in Stevens's case, any conviction would have resulted in a reversal for insufficient evidence, after which there can be no retrial. *See Burks v. United States*, 437 U.S. 1, 18, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).[5] Thus, under the *Somerville* approach, the prosecution's failure to produce an essential witness is simply a failure of proof. No retrial would be permitted no matter what the reason for the witness's unavailability.

Although some of the language in *Downum* supports such a broad result, it would be contrary to the courts' many refusals to adopt mechanical rules or tests for applying the Double Jeopardy Clause. Instead, lower courts have focused on factors such as the reason for and duration of the witness's unavailability and whether either party is at fault. The parties in this case focus on whether the government learned that essential testimony would not be forthcoming before or after the jury was sworn. This factor could explain *Wade* and *Downum*, as well as some lower court decisions. *See, e.g., United States v. Ziegele*, 479 F.2d 773, 775 (3d Cir.1973) (rejecting double jeopardy claim when government's key witness had become ill after start of first trial); *United States v. Gallagher*, 743 F.Supp. 745, 748–49 (D.Or.1990) (rejecting double jeopardy argument in part because "the government reasonably believed that [the witness] would testify when the trial began"). If this factor were determinative, then Stevens's double jeopardy claim would fail. The government knew that Pizzo was reluctant to testify and was prepared to overcome any valid legal objections he had to doing so: it subpoenaed him and prepared to offer immunity. It was not forewarned that he would refuse to testify even under the threat of contempt. In addition, as we discuss further below, there was nothing more the government could have done even if it had known in advance that Pizzo planned to refuse to testify. Even under the very high standard of government re-

3. One other unavailable-witness case was *Brock v. North Carolina*, 344 U.S. 424, 73 S.Ct. 349, 97 L.Ed. 456 (1953). There, the Court permitted re-prosecution after key witnesses asserted their Fifth Amendment privilege at the first trial. The second prosecution was initiated after those witnesses had lost appeals of their convictions and thus could no longer claim the privilege. *Brock*, however, was decided before the requirements of the Double Jeopardy Clause were held to be fully applicable to the states and was based on the standard enunciated in *Palko v. Connecticut*, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937). *See Brock*, 344 U.S. at 426, 73 S.Ct. 349. Two dissenting Justices believed that retrial in those circumstances was so far beyond the norm that it violated due process under the *Palko* standard. *See id.* at 435, 73 S.Ct. 349 (Vinson, C.J., dissenting); *id.* at 442, 73 S.Ct. 349 (Douglas, J., dissenting). Chief Justice Vinson emphasized that the prosecutor knew or should have known that the witness would refuse to answer the key questions. *See id.* at 431, 440, 73 S.Ct. 349 (Vinson, C.J., dissenting).

4. Military rules called for holding a court-martial near where the alleged crime occurred.

5. In this case, as in *Burks*, there is no claim "that the trial court committed error by excluding prosecution evidence which, if received, would have rebutted any claim of evidentiary insufficiency." *Burks*, 437 U.S. at 5 n. 4, 98 S.Ct. 2141. Even if there were, it is unclear whether re-prosecution would be permitted. *See Malinovsky v. Court of Common Pleas*, 7 F.3d 1263 (6th Cir.1993), *cert. denied*, 510 U.S. 1194, 114 S.Ct. 1300, 127 L.Ed.2d 652 (1994) (discussed below).

sponsibility for assuring the availability of its witnesses suggested by the language of *Downum* and *Cornero*, Pizzo's refusal to testify was as much of a surprise to the government as it was to the district court.

We do not think, however, that this factor is determinative. Relying exclusively on this factor, like relying exclusively on the two *Somerville* categories, would treat all cases the same regardless of the reason for the witness's absence. Timing is more important in a case like *Downum* or *Ziegele*. In *Ziegele*, if the prosecutor had known before empaneling the jury that the key witness was ill, the *Downum* rule would apply because the prosecutor would knowingly have taken a chance by proceeding. The proper course would have been to wait until the witness recovered. But the point at which the prosecutor learns that a witness will "absent" by refusing to testify does not necessarily affect what can be done. We held in *United States v. Johnson*, 736 F.2d 358 (6th Cir. 1984), that a recalcitrant witness cannot be held in contempt until actually called to testify. In so holding, we recognized that the government would be required to take a risk, since jeopardy would attach when the jury was impaneled. *See id.* at 360–61. We noted, however, that "[t]he government's real problem is not double jeopardy; it is [the witness's] recalcitrance." *Id.* at 363.[6] A somewhat analogous situation was presented in *Malinovsky v. Court of Common Pleas*, 7 F.3d 1263 (6th Cir.1993), *cert. denied*, 510 U.S. 1194, 114 S.Ct. 1300, 127 L.Ed.2d 652 (1994). There, the state was unable to obtain a ruling on the admissibility of its key evidence without going to trial. At trial, the court ruled that the evidence was inadmissible hearsay, and the state filed a mid-trial appeal. *Id.* at 1266. During the pendency of the appeal, which ultimately was successful, the trial court discharged the jury due to the government's failure to prosecute. *Id.* at 1269. We held that the Double Jeopardy Clause barred a subsequent prosecution.

■ In deciding whether a witness's unavailability creates a manifest necessity for a mistrial, it is helpful to consider what purpose is served by declaring a mistrial.[7] In the situations covered by the *Somerville* approach, a retrial is necessary to obtain a competent tribunal or to free the proceedings of a fatal procedural defect. In some cases of suddenly unavailable witnesses, such as *Wade* and *Ziegele*, the mistrial acts as an extended continuance to allow the witnesses to be present. Here, however, there are only two possible purposes served by the mistrial. One is to allow the government to gather more evidence against the defendant; this purpose is generally impermissible under the Double Jeopardy Clause. *See Washington*, 434 U.S. at 507–08, 98 S.Ct. 824; *Burks*, 437 U.S. at 10–11, 98 S.Ct. 2141. While the government might need some time to restructure its presentation, a short continuance should usually be sufficient. The other possible purpose is the hope that the witness will eventually agree to testify. This purpose is equally unacceptable. By

---

**6.** In a subsequent appeal, we affirmed a contempt order against the witness in *Johnson* for refusing to testify at a deposition ordered under Federal Rule of Criminal Procedure 15. *See United States v. Johnson*, 752 F.2d 206, 209–10 (6th Cir.1985). Although the witness was thus held in contempt prior to trial, the government did not thereby obtain any greater ability to coerce the witness's testimony than it had to coerce Pizzo's testimony in this case.

**7.** This approach is consistent with *United States v. Jorn*, 400 U.S. 470, 486, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971), which arguably quali-

fies as an unavailable-witness case. In *Jorn*, the trial judge rendered several witnesses temporarily "unavailable" by insisting that they could not testify until they had consulted attorneys about their Fifth Amendment privilege. The judge then declared a mistrial *sua sponte*. *Id.* at 472–73, 91 S.Ct. 547. Clearly, the witnesses' "unavailability" was easily curable. There could hardly be manifest necessity for a mistrial when a short continuance would have sufficed. Accordingly, the Supreme Court held that the Double Jeopardy Clause barred retrial. *Id.* at 487, 91 S.Ct. 547.

impaneling a jury and calling the witness, the government obtained an opportunity to coerce the witness's testimony. Pizzo spent three weeks in jail under a civil contempt order and was subject to additional criminal sanctions, but he did not change his mind. At this point, the government has had sufficient opportunity to make its case, and Stevens has endured a lengthy trial, not knowing until the end whether it would result in a verdict in his case. The purposes of the Double Jeopardy Clause would be defeated by allowing the government to make another attempt.

Unlike the court that decided *United States v. Gallagher*, we do not believe the Double Jeopardy Clause bars re-prosecution only when the court finds that the witness "will never agree to testify." *Gallagher*, 743 F.Supp. at 749. In some circumstances, such as sudden illness or other involuntary absence, the fact that the key witness will later be available justifies the delay and other burdens that a mistrial imposes on the defendant. Just as a mistrial allows an opportunity for the ill witness to be cured, proceeding with a trial gives the government the opportunity to "cure" the recalcitrant witness through contempt sanctions. Of course, if the witness turns out to be permanently unavailable—if illness ends in death rather than recovery—the government will be unable to proceed.[8] The government is similarly unable to proceed when contempt sanctions fail to overcome the will of a witness like Pizzo. Once the trial court has given up coercing the witness, the indictment cannot be kept alive indefinitely in the hope that the witness will someday have a change of heart.

Because each case must be decided on its own facts, we leave open the possibility of permitting retrial in a case like *Khait*, where the district court expressly found a "distinct possibility" that the defendant had threatened the witness. *See Khait*, 643 F.Supp. at 609; *see also United States v. Mastrangelo*, 662 F.2d 946 (2d Cir.1981) (establishing the rule followed in *Khait*), *cert. denied*, 456 U.S. 973, 102 S.Ct. 2236, 72 L.Ed.2d 847 (1982). In such a case, we might agree that the "ends of public justice would be ... defeated," *Perez*, 22 U.S. at 580, if the defendant by his own illegal actions could sabotage the government's case. *See Jorn*, 400 U.S. at 486 ("[T]he judge must bear in mind the potential risks of abuse by the defendant of society's unwillingness to unnecessarily subject him to repeated prosecutions.") (plurality opinion). The Double Jeopardy Clause might then permit giving the government the opportunity to gather more evidence or to assure the safety of the reluctant witness. We of course need not decide whether we would join the Second Circuit in allowing retrial whenever "at the time the trial judge is faced with the question he reasonably concludes that there is a distinct possibility that the defendant participated in making the witness unavailable," *Mastrangelo*, 662 F.2d at 952; whether we would require that the defendant's culpability be demonstrated at an evidentiary hearing; or whether we would, like the dissent in *Mastrangelo*, *see id.* at 954–955 (Meskill, J., dissenting), subject the district court's rejection of alternatives to particularly exacting review. In this case, the district court refused to find even a "distinct possibility" that Stevens was responsible for Pizzo's contempt. The government having had its opportunity to overcome that contempt, it is not entitled to subject both Stevens and Pizzo to repeated attempts.

## IV. CONCLUSION

Because Stevens's first trial ended when the government discovered that it lacked

---

8. In this discussion, we assume that, as in this case, the government lacks sufficient evidence to substitute for the unavailable witness's testimony. For example, if the government has the witness's prior, cross-examined testimony or other admissible hearsay, it will have suffi-
cient evidence to proceed after the witness's death. We do not decide whether the government is entitled to a mistrial and a chance to re-prosecute based on its key witness's illness, even if it has hearsay evidence that could be used in lieu of the witness's live testimony.

sufficient evidence to support a conviction, we hold that any subsequent attempt to prosecute Stevens for the same crime is barred by the Double Jeopardy Clause. We therefore **REVERSE** the decision of the district court and order that the indictment be dismissed with prejudice.

KENNEDY, Circuit Judge, dissenting.

While I do agree with the panel as to the importance of the defendant's right not to be placed twice in jeopardy, the Supreme Court has determined that "a defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments." *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 93 L.Ed. 974 (1949). Because I believe the circumstances presented here merit a finding of manifest necessity that "subordinates" the defendant's "right to have his trial completed by a particular tribunal" in favor of the public's interest in ensuring justice, I respectfully dissent.

The doctrine of manifest necessity, first set forth in *United States v. Perez*, 22 U.S. (9 Wheat) 579, 6 L.Ed. 165 (1824), established that a defendant could be retried after the judge, despite the defendant's objection, dismissed a hung jury. In that landmark opinion, Justice Story wrote:

> We think, that in all cases of this nature, the law has invested courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and in capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favor of the prisoner. But after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of Judges, under their oaths of office.

*Perez*, 22 U.S. (9 Wheat) at 580. In *United States v. Jorn*, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971), the Supreme Court repeated the warnings of *Perez* and stated that "the *Perez* doctrine of manifest necessity stands as a command to trial judges not to foreclose the defendant's option until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings." *Id.* at 485, 91 S.Ct. 547 (citing *Perez*, 22 U.S. (9 Wheat) at 580). Thus, as *Perez* and its progeny intimate, although courts are to rarely declare mistrials due to "manifest necessity," the test for doing so is a flexible one, "with reviewing courts analyzing the trial court's exercise of discretion in light of the particular facts and circumstances of each individual case." *Harpster v. Ohio*, 128 F.3d 322, 328 (6th Cir.1997).

Cases concerning the unavailability of essential witnesses, as the majority correctly points out, fall somewhere along this continuum. In *Wade*, the defendant faced a court-martial in Germany at the end of World War II. After the proceedings commenced, the Commanding General withdrew the charges and transmitted them to a different Commanding General due to the need to secure the attendance of additional witnesses in a time of war. 336 U.S. at 686–87. The Supreme Court determined that manifest necessity for the mistrial existed because of the "tactical situation brought about by a rapidly advancing army." *Id.* at 691, 69 S.Ct. 834. More specifically, the Supreme Court rejected the rigid rule set forth in *Cornero v. United States*, 48 F.2d 69 (9th Cir.1931), that

held absent witnesses cannot serve as a basis for denying a mistrial:

> We are asked to adopt the *Cornero* rule under which petitioner contends the absence of witnesses can never justify discontinuance of a trial. Such a rigid formula is inconsistent with the guiding principles of the *Perez* decision to which we adhere. Those principles command courts in considering whether a trial should be terminated without judgement to take "all circumstances into account" and thereby forbid the mechanical application of an abstract formula. The value of the *Perez* principles thus lies in their capacity for informed application under widely different circumstances without injury to defendants or to the public interest.

336 U.S. at 691, 69 S.Ct. 834. The Supreme Court reiterated this discretionary standard for unavailability cases in *Downum v. United States,* 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963), even though the Court determined that there was no manifest necessity because the prosecutor knew of the witness's likely absence prior to trial and could have proceeded to trial on the remaining four counts. *Id.* at 738, 83 S.Ct. 1033; *see also State v. Barthels,* 174 Wis.2d 173, 495 N.W.2d 341, 349 (1993) (finding no manifest necessity based primarily on *Downum* because the prosecutor was aware prior to trial that an essential prosecution witness would not appear at trial). However, the Court "refuse[d] to say that the absence of witnesses 'can never justify discontinuance of a trial,'" instead stating that "[e]ach case must turn on its facts." *Downum,* 372 U.S. at 737, 83 S.Ct. 1033 (quoting *Wade,* 336 U.S. at 691, 69 S.Ct. 834). Nonetheless, district courts must exercise caution when declaring mistrials due to the absence of prosecutorial evidence since appellate courts subject such rulings to the "the strictest scrutiny." *Arizona v. Washington,* 434 U.S. 497, 508, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978).

After reviewing this precedent, my colleagues reject an approach that considers the point at which the government learns of the witness's refusal or inability to testify. Instead, the majority opinion questions the "purpose" of the mistrial, finding that "the purposes of the Double Jeopardy Clause would be defeated by allowing the government to make another attempt" to prosecute Stevens. It seems that the majority fears that a finding of manifest necessity on these facts could lead to manipulation by the prosecution and provide the government with a more favorable opportunity to convict the defendant. District courts, however, are capable of discerning when a prosecutor has been neglectful or sly as opposed to genuinely surprised. *See, e.g., Downum,* 372 U.S. at 737–38, 83 S.Ct. 1033. Further, despite the majority's implication to the contrary, the "necessity" for the mistrial remains the same whether the prosecution witness becomes ill or unexpectedly refuses to testify. In both situations, the government is unprepared to proceed, through no fault of its own, by the unavailability of an essential witness. To hold otherwise, as the majority notes, places the government in an unenviable position: The government has to have a jury sworn before it can request that the witness be held in civil contempt, *United States v. Johnson,* 736 F.2d 358, 365 (6th Cir.1984),[1] but at the same time, double jeopardy attaches once the jury is sworn. This dilemma "invite[s] defendants to threaten, coerce, or otherwise intimidate principal government witnesses in order to

---

1. In a subsequent appeal in *Johnson,* this Court limited its prior holding and held that a witness could be held in contempt prior to trial under the Recalcitrant Witness Act for refusing to testify at a deposition ordered under Federal Rule of Criminal Procedure 15(a). *United States v. Johnson,* 752 F.2d 206, 209–210 (6th Cir.1985) (*"Johnson II "*). Prosecutors must show "exceptional circumstances ... in the interest of justice" to depose a prospective witness of a party for the purpose of using that deposition testimony at trial. Fed.R.Crim.P. 15(a). *Johnson II* is inapplicable here because it appeared that Pizzo would testify at trial, as he had in the grand jury proceedings.

avoid trial." *United States v. Khait,* 643 F.Supp. 605, 610 (S.D.N.Y.1986). Thus, by allowing the government to retry the defendant in cases of unavailable witnesses such as this one, courts avoid this result, adhere to the demands of public justice, and safeguard "society's interest in giving the prosecution one complete opportunity to convict those who have violated its laws." *Washington,* 434 U.S. at 509, 98 S.Ct. 824.

Moreover, the case law supports a finding of manifest necessity based on these facts. Two of our sister circuits have found manifest necessity when a prosecution witness becomes unavailable through no fault of the government. *See United States v. Shaw,* 829 F.2d 714 (9th Cir. 1987), *cert. denied,* 485 U.S. 1022, 108 S.Ct. 1577, 99 L.Ed.2d 892 (1988); *United States ex. rel. Gibson v. Ziegele,* 479 F.2d 773, 777 (3d Cir.), *cert. denied,* 414 U.S. 1008, 94 S.Ct. 370, 38 L.Ed.2d 246 (1973). In *Gibson,* the Third Circuit found manifest necessity when a prosecution witness became too ill to testify at trial and his testimony was essential to the case. 479 F.2d at 777. Similarly, in *Shaw,* the Ninth Circuit found manifest necessity when a key witness informed the court on the day of trial that she intended to invoke her Fifth Amendment privilege against self-incrimination. The prosecutor immediately offered the witness immunity, but the district court, unsure that the witness would accept the immunity deal, told the parties not to refer to the witness's expected testimony in opening statements. The prosecutor did not, but defense counsel made repeated references to the testimony and credibility of the witness in opening statements. *Shaw,* 829 F.2d at 718–19. The next day, the witness accepted the immunity deal and the court ordered the witness to testify. When she still refused to do so, the district court granted the mistrial motion over a defense objection. *See id.* at 719. The Ninth Circuit affirmed a finding of manifest necessity because "the trial judge gave both defense counsel and the prosecutor full opportunity to express their views on the propriety of a mistrial and ... [the judge] considered both curative jury instructions and the introduction of [the witness's] grand jury testimony as alternatives to a mistrial." *Id.* at 720. Coupled with the deference given to the district court and the prosecutor's efficient response by granting the witness immunity, the Ninth Circuit determined that these reasons were sufficient to declare a mistrial. *See also United States v. Gallagher,* 743 F.Supp. 745, 748–49 (D.Or.1990) (finding manifest necessity for mistrial when essential government witness abruptly and unexpectedly announced that he was a liar and refused to answer questions after both parties had emphasized witness's testimony in opening statements); *Khait,* 643 F.Supp. at 608–609 (unavailability of witness because of likely coercion and threats by defendant served as basis for mistrial after jury had been impaneled); *McCorkle v. State,* 95 Md. App. 31, 619 A.2d 186, 201 (Md.App.1993) (holding that absence of key prosecution witness through no fault of either party was sufficient to establish manifest necessity for a mistrial); *State v. Dunns,* 266 N.J.Super. 349, 629 A.2d 922, 938 (N.J.Super.App.Div.1993) (finding that manifest necessity existed to declare the mistrial because of the unavailability of an essential prosecution witness, but dismissing the charges against the defendant because of principles of "fundamental fairness," *i.e.,* the likelihood of success, the prejudicial impact on defendant, and other concerns).

The common thread throughout these cases is that of an essential government witness who became unavailable after the jury was impaneled and the witness' unavailability was a surprise, arose after the trial began, and was not due to the fault of the government. Drawing from the case law, it appears that a district court *may* find manifest necessity for a mistrial at the government's request when all of these circumstances converge. Of course, the district court must respond appropriately, either by proceeding with the trial and doing what can be done to cause the wit-

ness to testify or at least by considering a continuance. Further, the district court must examine whether the witness' absence has prejudiced the government in the eyes of the jury and whether a curative instruction would prove insufficient. *See Glover v. McMackin,* 950 F.2d 1236, 1242 (6th Cir.1991) (citing *Jones v. Hogg,* 732 F.2d 53, 56 n. 1 (6th Cir.1984)). Only in these relatively rare occasions when all of these factors are met may a district court correctly determine that "manifest necessity" exists and declare a mistrial.[2]

At first and last blush, the instant case meets this test for manifest necessity and falls within the handful of cases in which an essential witness becomes unavailable through no fault of the government.[3] Although the compulsion order here suggests that the government had some knowledge that Pizzo might be reluctant to testify because of self-incrimination, there is nothing to suggest that the government knew that Pizzo would refuse to testify because he feared for his safety or the safety of his family. The government indicated that Pizzo was on the government's witness list of February 19, 1997, and that the government had talked to Pizzo's attorney as of February 22 or 23, 1997, about testifying at trial and Pizzo's attorney responded that "they would be [at trial]." Once at trial, the district court observed that all parties appeared surprised that Pizzo would not testify and found that none of

the parties caused Pizzo's unavailability.[4] Although the defendant argues that the government should have more diligently verified that Pizzo would testify, even Pizzo's attorney testified that he knew of his client's wishes only one week prior to the trial. Further, despite the efforts of the United States Attorney to meet with Pizzo before trial, Pizzo's attorney never contacted the government to arrange a meeting and the government was not at liberty to contact him directly. Based on these considerations, the district court found that the testimony did not place the prosecutor on notice that Pizzo would refuse to testify. Instead, the government had "ensured [the witness's] actual physical presence at trial but could do no more than it did in attempting to compel [him] to speak." *Dunns,* 629 A.2d at 936.

In addition, both the government and the district court acted reasonably and swiftly in the face of Pizzo's refusal to testify. The government responded immediately by offering Pizzo immunity, which he refused, and then continued to try the case without Pizzo, hoping the contempt citation and incarceration would persuade him to testify. After this attempt proved futile, the government requested a mistrial. The district court delayed the trial, researched the issue, gave the contempt citation time to work on Pizzo, found that a limiting instruction could not adequately cure any prejudice, and finally, after full

**2.** Judicial economy may not serve as a basis for finding manifest necessity. *See United States v. Chica,* 14 F.3d 1527, 1532–33 (11th Cir.1994) (finding that at least four other circuits have so held); *United States v. Bridewell,* 664 F.2d 1050, 1051 (6th Cir.1981) (waste of federal resources is not a sufficient reason for finding manifest necessity).

**3.** Indeed, the district court hinted that one of the defendants may have been behind the threats made to Mr. Pizzo:

I think in this instance it is a little colored by the fact that Mr. Pizzo is deciding that he is not going to do this occurs while the Jury is impanelled (sic)—excuse me. Even though I'm not satisfied that either of these Defendants are on this record responsible

for it on the basis of any evidence I have, it causes me a little pause.

J.A. 302. The majority discusses the test set forth by the Second Circuit in *United States v. Mastrangelo,* 662 F.2d 946 (2d Cir.1981), in which the district court must find a "distinct possibility" that one of the defendants may have caused the witness to refuse to testify. *Id.* at 952. Based on the district court's statement here, such a "distinct possibility" may exist in this case.

**4.** Although the government admitted that it considered Pizzo a potentially hostile witness and thus produced the earlier compulsion orders, Pizzo apparently surprised everyone when he disclosed the alleged threats against him and refused to testify after being granted immunity.

briefing and argument from both parties, declared a mistrial. Arguably the trial court could have granted a longer continuance, but the trial already had proceeded for two and a half weeks and Pizzo showed no sign of wavering. Had the district court waited longer, the defendant possibly could have brought a successful appeal based on fundamental fairness and escaped all prosecution on these charges.

Accordingly, I believe that the district court acted appropriately in finding manifest necessity for the mistrial. Indeed, Pizzo still may testify in a trial against Stevens alone, a trial in which Pizzo's brother-in-law is not a co-defendant. Thus, this case does not present circumstances in which a retrial would be futile and double jeopardy may attach, e.g., the key prosecution witness dies after the jury is empaneled. Manifest necessity existed because, without Pizzo, there was no case against Stevens, the government did not cause Pizzo's unavailability, and the government had no notice that Pizzo would refuse to testify. For the stated reasons, I would affirm the denial of defendant's motion to dismiss the charges against him.