NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0055n.06

No. 12-3248

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jan 23, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| LONNIE DONALDSON, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | On Appeal from the United States District |
| | ) | Court for the Northern District of Ohio |
| v. | ) | |
| | ) | |
| FRANK BOVA, CUYAHOGA COUNTY | ) | OPINION |
| SHERIFF, | ) | |
| | ) | |
| Respondent-Appellee. | ) | |

**Before: McKEAGUE and STRANCH, Circuit Judges; COLLIER, District Judge.**[*]

**CURTIS L. COLLIER**, District Judge. Appellant Lonnie Donaldson ("Donaldson")

appeals the denial of his petition for a writ of habeas corpus. In 2009, six days into Donaldson's

capital murder trial, defense counsel discovered that their investigator had recorded conversations

with several testifying witnesses. Defense counsel claimed one witness's recorded interview

contradicted testimony given at an earlier hearing. When they informed the trial judge of the tapes,

counsel admitted they had not listened to the recordings in the nearly two-year period since they

were recorded. After hearing this candid admission, the trial judge declared a mistrial *sua sponte*

based upon defense counsel's deficient performance. When the case was reset for trial, Donaldson

filed a motion to dismiss the indictment on the grounds that his retrial was barred by the Double

Jeopardy Clause. Donaldson then filed a petition for a writ of habeas corpus pursuant to 28 U.S.C.

---

[*]The Honorable Curtis L. Collier, United States District Judge for the Eastern District of
Tennessee, sitting by designation.

§ 2241 in the Northern District of Ohio. The court denied the petition and dismissed the case, concluding that the mistrial was supported by manifest necessity. This court then granted Donaldson's application for certification of appeal "with respect to Donaldson's double jeopardy claim." For the following reasons, we **AFFIRM**.

**I**

On October 23, 2007, a grand jury charged Donaldson with aggravated murder with a mass murder specification in violation of Ohio Revised Code § 2903.01(A) and attempted murder in violation of Ohio Revised Code §§ 2903.02(A), 2923.02. Donaldson's trial began on December 2, 2009 and he was represented by Jeffrey Saffold and Thomas Rein ("defense counsel"). On December 3, 2009, defense counsel informed the trial court they did not know if the statements of a witness to their investigator had been transcribed into a statement. Defense counsel claimed they asked the investigator to provide a copy of a memorandum describing the interview, and they also asked him if there were any "audio statements." The court asked defense counsel if there were any other statements or notes of witnesses, and defense counsel only indicated one such statement.

However, on December 8th, defense counsel spoke to a witness, Jahmil Young, in the courthouse hallway. Young informed defense counsel he had spoken with the county prosecutors and gave a recorded interview to a homicide detective. According to defense counsel, Young told the detective he had been shot in a location different from where he initially claimed he was shot. Mistakenly believing that this recording was made by law enforcement, defense counsel claimed such exculpatory evidence should have been previously disclosed. The prosecutor, however, stated it was not the practice of homicide detectives to record telephone interviews with witnesses. But, as far as he was aware, that was the practice of defense counsel's investigator.

The following day, defense counsel admitted they had only then become aware of audio recordings made by their investigator, some of which contained interviews with trial witnesses. Outside court, defense counsel played a portion of one recording for the prosecutor, the contents of which counsel then claimed directly conflicted with the testimony of a witness at a preliminary hearing. Defense counsel informed the court there were two tapes, each approximately one hour in length, although they could not be sure if they had obtained all the recordings.[1]

The trial court ordered defense counsel to allow review of the tapes by the prosecutor. Defense counsel were hesitant to comply because they had not listened to the tapes and wanted to review their contents before the prosecutor heard them as well.[2] The prosecutor suggested defense counsel hand over the investigator's work file and the tapes to the court for in camera consideration. Again, defense counsel expressed hesitation because the trial court, this being a capital case, would be tasked with deciding whether Donaldson would receive the death penalty and might be prejudiced by the contents of the tapes.[3]

---

[1]COURT: I'm asking you: When Mr. Turpin [the defense investigator] made you aware of these tapes, or when he gave them to you - - did he give them to you personally?
REIN: He gave me one, and I said, Are there any others?
And he said, Yes, there's one, and he gave me both of them.
COURT: And did you say, Are there any more?
REIN: I did not ask that.
COURT: So do you know if there are any more? Do you believe there are any more? Do you believe you have them all?
REIN: I do not know, Judge.

[2]Defense counsel expressed some concern the tapes may contain a statement made by Donaldson himself.

[3]"[U]nder Ohio's [death penalty] scheme, the trial judge is given the statutory responsibility to reweigh the aggravating circumstances and mitigating factors before determining whether to impose a death sentence or a life sentence. Ohio Rev. Code § 2929.03(D)(3). Then, the trial judge must state h[er] sentencing findings in a separate opinion.

-3-

The court held a brief recess during which defense counsel was to provide the tapes to the prosecution, but the prosecution did not receive the tapes during the break. When the court asked why the tapes had not been provided to the prosecution, defense counsel made a new objection to turning over the tapes on the basis of work product and attorney-client privilege, stating they did not believe the tapes were discoverable. The court clarified that she only expected defense counsel to provide the portions of the recording that were inconsistent with testimony. The court then instructed defense counsel to listen to the tapes and provide her with those inconsistent portions.

After defense counsel finally reviewed the tapes, they stated that only three testifying witnesses could be heard and none of their statements was consequential. For instance, the supposedly inconsistent statement played for the prosecutor was in fact a hearsay statement the witness was merely repeating. Defense counsel suggested they had needlessly caused "alarm" because the tapes contained nothing that would affect the trial. The prosecutor, however, stated he heard only a small portion of the tape and questioned defense counsel's representations.

The court then asked defense counsel when the tapes were made. As it happens, they were made in February 2008—some twenty-two months previously. The court expressed its "grave concern" that defense counsel did not know of or listen to the recordings until the sixth day of trial. The court's concern had "shifted" beyond the discovery issue. In an attempt to assuage the court's concerns, defense counsel claimed they previously received memoranda from their investigator outlining the contents of his interviews with witnesses, although they were not aware that he had actually recorded them. The prosecutor shared the court's concern that "two appointed defense counsel stand up and tell [the court], in the sixth day of trial, that they commenced this capital case

Ohio Rev. Code § 2929.03(F)." *Buell v. Mitchell*, 274 F.3d 337, 368 (6th Cir. 2001).

without knowing the fruits of their own defense investigation." The court responded that it too found this issue troubling.

At this point, the prospect of a mistrial was raised. The prosecutor noted the presence of some "tricky issues" with respect to double jeopardy, but argued that if the trial proceeded, an appellate body would likely find defense counsel's conduct sufficient to reverse the conviction. The court then engaged in a colloquy with the head of the appellate unit, who was present in the courtroom, about the circumstances under which a mistrial would be appropriate:

> Here's what I would like to know, and maybe your appellate counsel can inform me, because at what point does ineffective assistance of counsel attach?
> Must counsel be effective in plea negotiations? Must they be effective in pretrial discovery? Must they be effective during pretrial motion hearings?
> Because if it is true that they learned something new yesterday from Jahmil Young that they thought was because he was talking to homicide, and now they know he was talking really, in February of 2008, to their own agent, when does ineffective assistance of counsel attach?
> Can we cure that on the sixth or seventh day of trial, or must counsel be effective during voir dire, during pretrial hearings, during pretrial motions?
> That's what concerns me.

The appellate unit head advised the court that an in camera review of the tapes should be conducted. After further discussion, the court indicated it would do more research but that it was "very, very, very troubled by these turn of events," and openly questioned whether Donaldson was receiving effective assistance of counsel. Defense counsel informed the court they had spoken with Donaldson who was "in no way desirous of a mistrial." The court adjourned and notified counsel they should file briefs on the topic, if they wanted to, by 7:30 the following morning.

When morning came, the court addressed the issue with the benefit of the prosecution's brief. Defense counsel, for whatever reason, did not file a brief on the topic. The prosecution maintained its position the court should review the tapes before declaring a mistrial. If necessary, the

prosecution also suggested the court conduct voir dire with the witnesses whose interviews were captured on the tapes. Defense counsel reiterated their position that nothing on the tapes was consequential.

The court began by discussing the two-prong standard for ineffective assistance of counsel stated in *Strickland v. Washington*: deficient performance and prejudice. The court concluded defense counsel's failure to review the tape recordings until the sixth day of trial "was outside the range of professionally competent assistance, and the presumption of counsel's competence ha[d] therefore been rebutted." The court also pointed to counsel's "ever changing report" of what the tapes contained and how they affected the trial. This ineffectiveness "call[s] into serious question whether the defendant is receiving a fair trial." The court then acknowledged that it faced a "novel predicament" in considering the prejudice prong because the trial had not reached a determination of guilt. The court concluded it could not "assess whether the omission in this case was actually prejudicial to the defendant." However, the court could not overlook counsel's conduct and continue with the trial as if it had not occurred, especially considering the court could find "no cure" for it.

The court concluded, therefore, that Donaldson could not receive a fair trial. "By knowing the defendant's counsel's representation has been deficient, and by feeling compelled to investigate whether counsel's assistance was ineffective, the Court f[ound] that this situation in and of itself present[ed] a situation in which a mistrial must be declared." The court also rejected the other options before it. In camera inspection of the tapes, for instance, would place an undo burden on the court by "requiring the Court to assess what other courts have previously addressed only in hindsight." Indeed, "[w]hile there may be some possible glaring inconsistencies, the Court would

not know all of them until the conclusion of the case." The court also questioned its ability to be fair and impartial during the sentencing phase, at which point it would be required to decide whether Donaldson would be put to death for his alleged conduct. The court concluded,

> With these concerns in mind, the Court finds that public justice cannot be served without declaring a mistrial.
> While the Court makes no finding as to whether defendant's counsel's assistance was actually ineffective, the Court finds that the ends of justice would be defeated if a mistrial were not declared at this time.
> The Court has conducted a scrupulous search for alternatives in order to avoid this last resort, but declaring a mistrial is manifestly necessary and hereby declared in order to insure [sic] the guarantees of a fair trial and the effective assistance of counsel as required by the Constitution.

The court then discharged Donaldson's defense counsel and informed the parties it would appoint new counsel.

On March 13, 2010, now represented by new counsel, Donaldson filed a motion to dismiss the indictment based upon the Double Jeopardy Clause. The trial judge denied the motion without opinion five days later. The judge subsequently recused herself, and Donaldson refiled his motion to dismiss before a new judge. In April 2011, the new judge also denied the motion.

Donaldson then filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 in the U.S. District Court for the Northern District of Ohio.[4] The petition was referred to the Magistrate Judge for preparation of a report and recommendation. The Magistrate Judge recommended the petition be denied, concluding that the trial judge's finding of manifest necessity was reasonable. After Donaldson objected, the District Judge accepted and adopted the report and recommendation, rejecting Donaldson's objections and denying the petition for a writ of habeas

---

[4]The petition listed Robert Reid, then Sheriff of Cuyahoga County, Ohio, as respondent. On appeal, Respondent-Appellee informed us pursuant to Fed. R. App. P. 43(c) that Frank Bova is now the Sheriff of Cuyahoga County.

corpus. This court then granted Donaldson's application for a certificate of appealability with respect to his double jeopardy claim.[5]

## II

Before the district court, the parties disputed whether 28 U.S.C. § 2254's deferential standard of review should apply or whether the less demanding 28 U.S.C. § 2241 standard should apply. Under § 2254, an incorrect factual determination of the state court will only warrant federal habeas relief if it was "unreasonable . . . in light of the evidence presented in the State court proceeding." *Phillips v. Court of Common Pleas*, 668 F.3d 804, 810 (6th Cir. 2012) (quoting § 2254(d)(2)) (internal quotation marks omitted). And where relief "is predicated on a state court's alleged misapplication of the law to the facts, federal relief is prohibited unless the application of Supreme Court precedent was 'unreasonable.'" *Id.* (quoting § 2254(d)(1)). The § 2241 standard, however, is "significantly less demanding." *Id.* Under that standard, this court conducts a de novo review of the state court proceeding. *Id.*

The district court did not affirmatively decide under which section Donaldson's petition should be reviewed, because both the Magistrate Judge and the District Judge concluded he was not entitled to relief under either standard. Respondent in this case does not "concede" that such a petitioner would be subject to the less demanding standard of § 2241 in "all pretrial habeas cases[] that raise double jeopardy violations" but agrees with the district court that Donaldson should lose under either standard. It is clear, however, that "the deference [] § 2254(d) requires never applies to habeas petitions brought by pretrial detainees under § 2241." *Id.* And this court recently applied

---

[5]In the district court, Donaldson filed a motion to stay the state trial pending resolution of the petition for a writ of habeas corpus. The court later denied the motion as moot after it was informed the state court itself entered such a stay.

this standard to a similar pre-retrial double jeopardy petition. *Smith v. Coleman*, 521 F. App'x 444, 447 (6th Cir. 2013). Accordingly, we review the state court record de novo.[6]

**III**

Donaldson argues retrial on these charges would violate the Double Jeopardy Clause because the trial court's declaration of mistrial was not supported by manifest necessity. Donaldson also argues, for the first time on appeal, that removing original defense counsel violated his right to due process.

**A**

The Double Jeopardy Clause of the Fifth Amendment[7] "protects a criminal defendant from repeated prosecutions for the same offense." *Phillips*, 668 F.3d at 811 (quoting *Oregon v. Kennedy*, 456 U.S. 667, 671 (1982)) (internal quotation marks omitted). "[I]t is well-settled that once jeopardy attaches, prosecution of a defendant other than before the original jury is barred unless (1) there is a manifest necessity for a mistrial or (2) the defendant either requests or consents to a mistrial." *Colvin v. Sheets*, 598 F.3d 242, 252 (6th Cir. 2010) (quoting *Johnson v. Karnes*, 198 F.3d 589, 594

---

[6]Donaldson's petition is properly in federal court. The Double Jeopardy Clause protects defendants from being "twice placed in jeopardy," which means his double jeopardy challenge should be heard before retrial. *Phillips*, 668 F.3d at 810–11; *Harpster v. Ohio*, 128 F.3d 322, 325–26 (6th Cir. 1997). "[T]he federal adjudication of double jeopardy claims raised on pre-trial petitions for habeas corpus is appropriate when those claims have been raised and rejected in the state trial court and under state law there is no right to interlocutory appeal." *Harpster*, 128 F.3d at 325–26. Because, under Ohio law, denial of a motion to dismiss on the basis of double jeopardy is not an appealable order, federal adjudication of Donaldson's habeas petition is appropriate. *Phillips*, 668 F.3d at 811.

[7]The Double Jeopardy Clause is applicable to the states through the Fourteenth Amendment. *Benton v. Maryland*, 395 U.S. 784, 787 (1969).

(6th Cir. 1999)) (internal quotation marks omitted). This case deals only with the former; we must determine whether the trial court appropriately found a manifest necessity for a mistrial.

A trial judge may only declare a mistrial if, after "taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated." *Id.* (quoting *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824)). This standard, however, must not be applied mechanically: "[I]t is manifest that the key word 'necessity' cannot be interpreted literally; instead, . . . we assume that there are degrees of necessity and we require a 'high degree' before concluding that a mistrial is appropriate." *Arizona v. Washington*, 434 U.S. 497, 506 (1978). Courts thus apply a "sliding scale of scrutiny" regarding manifest necessity: the strictest scrutiny applies when the basis of the mistrial is judicial or prosecutorial misconduct; the greatest deference extends to mistrials declared due to a deadlocked jury. *Colvin*, 598 F.3d at 253. A "reviewing court must be satisfied that the trial judge did not act irrationally or irresponsibly, but exercised 'sound discretion.'" *Ross v. Petro*, 515 F.3d 653, 661 (6th Cir. 2008) (quoting *Washington*, 434 U.S. at 514).

In summary, for a double jeopardy claim after a mistrial, we determine where on the sliding scale of scrutiny the standard of review falls according to the issues on which the mistrial was based. *United States v. Stevens*, 177 F.3d 579, 583 (6th Cir. 1999). "The appropriate standard of review is determined by whether the underlying reasons for the mistrial concern issues best left to the informed discretion of the trial judge or issues that resemble pure questions of law for which closer appellate review is appropriate." *Id.* In *Stevens*, this court applied a flexible standard of review, giving greater deference to certain district court determinations and stricter scrutiny to others. *Id.* This flexible approach is appropriate here.

**1**

We begin by evaluating whether the trial court properly considered the Sixth Amendment right to a fair trial and to effective counsel as the context for its manifest necessity analysis. Donaldson argues that it did not. The crux of his argument is that the trial court relied upon defense counsel's alleged ineffectiveness but did not make a prejudice finding consistent with *Strickland v. Washington*, 466 U.S. 668 (1984).

Based on the Sixth Amendment's guarantee that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense," a defendant also has a right to "reasonably effective assistance" of counsel. *Strickland*, 466 U.S. at 687. In *Strickland*, the Court established the familiar two-pronged test for evaluating claims of ineffective assistance of counsel: deficient performance and prejudice. When analyzing the deficient performance prong, courts consider an attorney's conduct based on its "reasonableness under prevailing professional norms." *Id.* at 688. However, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. In order to demonstrate such an effect, courts consider the prejudice prong, which requires "there [be] a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* Donaldson faults the trial court in this case for failing to make any finding that he was prejudiced by defense counsel's conduct.

-11-

To some degree, Donaldson's argument has a superficial appeal. After all, the trial court explicitly referred to the *Strickland* standard as an analogue for its ruling and relied on *Strickland*'s guidance to determine that defense counsel's performance was so deficient as to require a mistrial. However, requiring a trial court judge to make a finding of prejudice mid-trial would create serious difficulties. Were this court to require such a finding whenever a mistrial is based upon ineffective assistance of counsel, no trial judge could declare a mistrial on the basis of counsel's ineffectiveness before the return of a verdict. Because no prejudice under the *Strickland* standard could be shown–in that there is no result yet to be impugned by counsel's deficient performance–even if a trial court is convinced the defendant is not receiving a fair trial, it would be required to carry through to verdict.[8] Even were this court to adopt some speculative prejudice standard, where the trial court must find that *if* a defendant were convicted the ineffectiveness *would* impugn his conviction, courts would have difficulty applying that standard, as they would be without the benefit of further evidence to be offered.[9] Given this difficulty, courts would be unlikely to find declaring a mistrial appropriate under these circumstances. But after the jury returns a conviction, the defendant would then be required to engage in collateral attack of his conviction based on the flaw that was readily apparent to the trial judge. Because *Strickland* is deferential to counsel, *see id.* at 689 (explaining that judicial scrutiny should be deferential to counsel because it is "all too tempting"

---

[8]Donaldson argued as much before the district court, citing a handful of state cases that the district court distinguished. He does not urge this court adopt such a rule on appeal and does not cite these state cases.

[9]Donaldson suggests the court adopt such a standard. He acknowledges the "conceptual difficulties" with this approach but suggests the court "pretend that a conviction ultimately followed" and "work backward" to find prejudice based on counsel's failure to listen to the recordings.

to second-guess strategy after conviction and because a fair assessment is difficult to make with the "distorting effects of hindsight"), the defendant must do so at a disadvantage he would not face were a mistrial declared.[10]

Moreover, strictly imposing the *Strickland* standard to declarations of mistrial would conflict with the underlying principles of the manifest necessity standard. After all, under *Strickland*, a court must always find both deficient performance and prejudice. On the other hand, manifest necessity is a standard intentionally devoid of hard-and-fast rules:

> We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere.

*Perez*, 22 U.S. (9 Wheat.) at 580. Not only did *Perez* establish a case-by-case approach, but "[i]n the years since, the Court has 'explicitly declined the invitation of litigants to formulate rules based on categories of circumstances which will permit or preclude retrial.'" *Harpster*, 128 F.3d at 328 (quoting *United States v. Jorn*, 400 U.S. 470, 480 (1971)). Although *Strickland* certainly allows for consideration of the unique circumstances of a case, imposing its strict two-part formula to every mistrial declared on the basis of ineffective assistance would conflict with this long-held reluctance to establish a clunky, universal inquiry.

---

[10]And once he finds his way to federal court, he faces an even more difficult task. Post-conviction claims of ineffective assistance of counsel arising out of state court are doubly deferential. *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) ("When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.").

-13-

This incongruity stems from a basic distinction: *Strickland* defines the standard for finding ineffective assistance of counsel under the Sixth Amendment; manifest necessity, on the other hand, is an exception to the Double Jeopardy Clause of the Fifth Amendment. The ineffective assistance of counsel standard, requires that "[c]ounsel's errors [] be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Harrington*, 131 S. Ct. at 787–88 (quoting *Strickland*, 466 U.S. at 687). At base, courts must determine whether counsel was functioning as "counsel guaranteed the defendant by the Sixth Amendment," which "ensure[s] that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." *Strickland*, 466 U.S. at 687, 691–92 (internal quotation marks omitted). Meeting this standard is a heavy burden because an "intrusive post-trial inquiry" could threaten the integrity of the adversarial process. *Id.* at 788.

Manifest necessity is not exclusively premised on protecting a defendant's rights; rather, manifest necessity balances the defendant's "valued right to have his trial completed by a particular tribunal," *Washington*, 434 U.S. at 503, with "the public's interest in fair trials designed to end in just judgements," *id.* at 516 (quoting *Wade v. Hunter*, 336 U.S. 684, 689 (1949)). Manifest necessity thus requires we be deferential, in the appropriate degree, to the trial judge, not to defense counsel or to the defendant. *Id.* at 514 ("[A] trial judge's decision to declare a mistrial based on his assessment of the prejudicial impact of improper argument is entitled to great deference . . . .").

Balancing these disparate focuses, the trial court in this case looked to the Sixth Amendment through the prism of *Strickland* as providing the context of its mistrial analysis. The trial court appropriately recognized it was not in a position to make a finding of prejudice and declined to do so. However, after concluding defense counsel's performance "was outside the range of professionally competent assistance, and the presumption of counsel's competence ha[d] therefore

-14-

been rebutted," the trial court concluded this performance "call[ed] into serious question whether the defendant [wa]s receiving a fair trial." Finding the ends of justice would be defeated were a mistrial not declared, the trial court declared a mistrial in order to ensure "the guarantees of a fair trial and the effective assistance of counsel as required by the Constitution."

Rather than attempting to superimpose the *Strickland* standard mid-trial, the trial court used it as a guidepost to navigate the contours of manifest necessity. In so doing, the trial court adequately addressed the underlying principles of both standards. In the trial court's view, defense counsel's deficient performance called into question the reliability of the proceedings, which conflicted with the Sixth Amendment's requirement "that a defendant ha[ve] the assistance necessary to justify reliance on the outcome of the proceeding," *Strickland*, 466 U.S. at 691–92. The court concluded this unreliability raised serious questions about the fairness of the proceedings, and it exercised its discretion to declare a mistrial on that basis. This finding was consistent with the manifest necessity standard's focus on "the public's interest in fair trials designed to end in just judgements." *Washington*, 434 U.S. at 516. In light of the trial court's careful consideration of both standards, we conclude that it was not required to make a prejudice finding and that it used the proper legal context for its manifest necessity analysis.

**2**

However, this does not end our inquiry. Considering the mistrial under the traditional "sliding scale of scrutiny," we "must be satisfied that the trial judge did not act irrationally or irresponsibly, but exercised 'sound discretion.'" *Ross*, 515 F.3d at 661. Important to this case, given the de novo review standard of § 2241, this deferential standard of review is separate from the habeas standard. *Id.* at 661 (concluding a federal court analyzing a double jeopardy claim under §

-15-

2254 must "scrutinize the state court ruling through two lenses of deference": the statutory deference in § 2254 and the deference called for in *Washington*).

Donaldson does not dispute that the "sliding scale" should apply here, but he argues that the court should apply a relatively stricter standard of review on that spectrum. Not as strict as we might apply if a trial judge declared a mistrial to "buttress" the prosecution's case, he concedes, but securely on the "less deferential side of the spectrum" since we have the full benefit of the relevant portions of the trial transcript and as much knowledge about the tape recordings as did the trial judge.[11] However, this court often has the benefit of a full transcript of the proceedings when it defers to a trial judge's finding of manifest necessity based on her greater familiarity with the case, the litigants, the jury, and the evidence. *See Washington*, 434 U.S. at 513–14 (holding a trial court's impression of possible jury bias is due special deference because the court is "most familiar with the evidence and the background of the case," observed the jurors, and heard the jurors during voir dire). A stricter scrutiny of the trial court's conduct is not called for here, because the trial court is more familiar with defense counsel and had the opportunity to observe defense counsel's conduct both for the trial and the pretrial proceedings as well. Moreover, the trial court's decision was based partially on its observation of counsel's "ever changing" representation of the contents of the tapes, a determination that–at least in part–turns on counsel's credibility, which is a traditional basis for deference to a trial court's determination. *See United States v. Hill*, 195 F.3d 258, 264–65 (6th Cir. 1999) ("[W]e must give deference to the district court's assessment of credibility inasmuch as the

---

[11]Donaldson also argues a stricter standard is appropriate because the trial court misapplied the well-established *Strickland* standard, which demonstrates that it acted "irrationally or irresponsibly." But we have already rejected the claim that the district court erred at law by failing to make a prejudice finding.

-16-

court was in the best position to make such a determination."). And this court is particularly reluctant to substitute its judgment for that of the trial court when a defendant's lawyer is at fault for the mistrial. *Colvin*, 598 F.3d at 255 ("[W]e should be especially reluctant to second-guess the judgment of the trial court in cases where, as here, the conduct of the defendant's own lawyer causes a mistrial."). Accordingly, we apply a relatively deferential review to the trial court's decision.

The trial court in this case concluded the poor performance of defense counsel was sufficient to declare a mistrial. Defense counsel had not reviewed the tape recordings of several witnesses, some of whom testified at trial. Defense counsel were aware the interviews were conducted but were not aware they had been recorded until well into trial. And defense counsel did not make the judge's task any easier. When they mistakenly believed this recording was in the prosecution's possession, they were incensed that it had been withheld from them. Then, after discovering the recordings were actually their own, they played a very limited portion of the recording to the prosecutor, indicating one witness may have perjured herself in an earlier hearing. The prospect of the prosecutor listening to the rest of these recordings was then raised. At that point, defense counsel were hesitant to disclose the contents of these recordings, which just hours before they had considered improperly withheld from them. When the alternative approach of allowing the judge to review the tapes herself was considered, counsel persisted in their hesitance; the judge may be prejudiced by the contents of this tape and she would be tasked with deciding whether Donaldson would be put to death. Defense counsel thus provided the court very little choice: either take on faith that the recordings were of little or no importance, or declare a mistrial. That faith would necessarily be placed in two lawyers who failed to obtain these tapes for twenty-two months and

-17-

whose representation of the contents of the tapes was, in the words of the trial judge, "ever changing."

The record supports the trial court's concern with counsel's shifting representations. When the existence of a recording was first raised, defense counsel claimed that a witness, Jahmil Young, stated he had given a recorded statement to law enforcement. It was the ensuing discussion, and the prosecutor's observation that Donaldson's investigator records his interviews, that led to the discovery of the tape recordings. But Young was not listed among the witnesses defense counsel claimed were on the two one-hour tapes. The existence of a tape containing Young's interview was not further discussed by defense counsel until the issue was raised by the prosecution, and at that point defense counsel's representation of the importance of Young's conflicting statements was markedly changed. This is particularly surprising in light of their earlier insistence his story conflicted dramatically on an important issue.

And at the beginning of the trial, before this issue arose, when asked whether they were aware of any physical statement of a particular witness, defense counsel stated they did "not know whether there [wa]s a physical statement." In response to the prosecution's request, they called their investigator and asked whether there were any written statements from this witness "or audio statements." It must have been particularly vexing to the trial judge that counsel were apparently aware of the possibility of recorded statements of witnesses but had failed to discuss them with their investigator until six days into a capital murder trial. Perhaps more troubling, defense counsel were not sure whether a statement of Donaldson himself was on the tapes.

Donaldson also faults the trial court for failing to consider alternatives to mistrial. Donaldson argues the trial court should have conducted an in camera review of the contents of the

tapes in direct contravention of what defense counsel argued at the time. The trial court concluded it would be incapable of discerning all the possible inconsistencies at that time, especially considering that not all the evidence had yet been presented. Moreover, the trial court shared defense counsel's concern that the contents of the recordings might prejudice the court were it later in a position to decide whether Donaldson should receive the death penalty. The trial court did in fact consider this alternative and explained its reasons for declining to make use of this option. Its choice was buttressed by defense counsel's objection to such an in camera review, something Donaldson wholly ignores here.[12] *See Ross*, 515 F.3d at 668 (stating that a judge's decision not to conduct voir dire examination of jurors in keeping with the preference of both parties was arguably the more prudent course).

The trial court in this case was confronted with defense counsel who were aware their investigator recorded his interviews with witnesses but had not asked him whether any recordings of such interviews existed as to testifying witnesses and had not listened to any such recordings some six days into a capital murder trial. The court was also faced with defense counsel whose representation of the contents of the tapes shifted dramatically in a twenty-four-hour span. Although it could have listened to the tapes itself, it provided sound reasoning for declining this option. Unlike many cases, the trial court was cognizant that it may be called to find facts on an issue of grave importance, that is, whether Donaldson would receive the death penalty. More to the point,

---

[12]In his reply brief, Donaldson simply states the power to declare a mistrial should not lie in counsel's hands, which is somewhat inconsistent with his position the trial court erred by declaring mistrial over Donaldson's objection. Moreover, Donaldson argues defense counsel would have chosen in camera review over a mistrial had they been given the option. Of course, the trial court provided an opportunity for briefing before it made its decision and after it openly acknowledged it might declare a mistrial. Defense counsel, however, did not submit a brief and provided no explanation for their failure to do so.

defense counsel objected to the trial court reviewing the tapes. The court was faced with bad options: either proceed through trial and possibly sentence a defendant to death in reliance on the assurances of incompetent counsel, or declare a mistrial to ensure the ends of justice are achieved. Under these circumstances, and considering the deference due to the trial court's discretion under the "sliding scale" review standard, we conclude the trial court exercised sound discretion when it declared a mistrial.

**B**

Donaldson also raises new arguments that were not raised below. Donaldson argues the trial court violated his right to due process when it removed original defense counsel from the case after it declared a mistrial. He also makes a speedy trial argument in passing. Donaldson argues these issues are "part and parcel" of his double jeopardy claim. These arguments, however, are not properly before the court.

These claims were not raised below and "the court will consider an issue not raised below only when the proper resolution is beyond doubt or a plain miscarriage of justice might otherwise result." *DaimlerChrysler Corp. Healthcare Benefits Plan v. Durden*, 448 F.3d 918, 922 (6th Cir. 2006). No miscarriage of justice results from Donaldson being appointed new counsel. Nor is the lengthy time he has spent awaiting trial cause for concern given that a large portion of the delay results from a stay he moved for in order to accommodate the instant petition for habeas relief. Moreover, these issues fall outside the scope of the certificate of appealability, which was limited to Donaldson's double jeopardy claim. *See Hill v. Mitchell*, 400 F.3d 308, 329 (6th Cir. 2005) ("Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken

-20-

to the court of appeals from [ ] the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court." (quoting 28 U.S.C. § 2253(c)(1)).

Further, as noted *supra* note 6, this pretrial petition is properly before the court because double jeopardy concerns must be addressed before retrial, and the denial of a motion to dismiss an indictment is not a final appealable order in Ohio. However, these additional issues are not properly before this court. Typically, "[h]abeas petitioners must exhaust all available state court remedies before proceeding in federal court, and this usually requires that they appeal an adverse decision all the way to the state's court of last resort." *Phillips*, 668 F.3d at 810. There is no suggestion in the record or on appeal that either of these issues was raised in the state trial court. Accordingly, we do not entertain these arguments.

## IV

For the foregoing reasons, we **AFFIRM** the district court's denial of Donaldson's 28 U.S.C. § 2241 motion.